303 F.3d 1074
 Tausha PRINCE, a minor, by and through her parents; James Prince; Kimberly Prince, Plaintiffs-Appellants,
v.
Jill JACOBY, Superintendent of Bethal School District; Tim Sherry, Principal of Spanaway Lake High School; Bonnie Kenigson, Assistant Principal of Spanaway Lake High School, Bethel School District in their official capacities; Bethel School District, Defendants-Appellees.
 No. 99-35490.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 9, 2001.
 Filed September 9, 2002.
 
 COPYRIGHT MATERIAL OMITTED Keith A. Kemper, Ellis, Li & McKinstry, Seattle, WA, Walter M. Weber, The American Center for Law and Justice, Washington, DC, David A. Cortman, Panama City Beach, FL, for the plaintiff-appellant.
 John H. Binns, Jr. & Daniel C. Montopoli, Vandeberg Johnson & Gandara, Tacoma, WA, for the defendants-appellees.
 Aaron H. Caplan for the American Civil Liberties Union of Washington, Seattle, WA, and Sue Stengel for the Anti-Defamation League of B'nai B'rith, Las Angeles, CA, amici in support of defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington Franklin D. Burgess, District Judge, Presiding.
 Before HALL, WARDLAW and BERZON, Circuit Judges.
 Opinion by Judge WARDLAW; Concurrence by Judge HALL; Partial Concurrence and Partial Dissent by Judge Berzon.
 OPINION
 WARDLAW, Circuit Judge.
 
 
 1
 In this private right of action under the Equal Access Act (the "Act") and the First Amendment, Tausha Prince, an eleventh grade student at a Bethel School District ("School District") public high school, challenges the school's refusal to allow her Bible club to meet as an Associated Student Body ("ASB") club, entitled to the same benefits as other student clubs. Instead, Prince's club was recognized only as a "Policy 5525 club," which limited her club's access to benefits offered by the high school. Prince appeals from the district court's grant of summary judgment in favor of the School District, in which the district court found that the Equal Access Act and the Establishment Clause forbid offering a religious club the various advantages offered to other student clubs.
 
 
 2
 We consider each of Prince's access claims separately, first under the Act, and then the First Amendment, to the extent we find them outside the scope of the Act. Having done so, we hold that the School District violated either the Act or Prince's First Amendment rights by denying her Bible club the same rights and benefits as other School District student clubs and by refusing to allow the Bible club equal access to school facilities on a religion-neutral basis. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse the district court's decision.
 
 I. Background
 
 3
 Tausha Prince, an eleventh grade student at Spanaway Lake High School, and other students established a Christian Bible club called the "World Changers." The purpose of World Changers is to address issues of interest to students from a religious perspective, including service to the student body and the community, diversity and acceptance of all people, helping students to cope with daily pressures, as well as "celebrating" and "sharing" the Gospel of Jesus Christ. The School District rebuffed Prince's attempt to form the club as an officially recognized ASB noncurriculum-related club. Prince, through counsel, wrote to the School District suggesting that the refusal to recognize the World Changers as an ASB group violated the Act. In response, the School District stated that under District Policy 5525, religious organizations could be formed only as Policy 5525 clubs. After the school denied her second request to form as an ASB group, Prince submitted an application to form her club as a Policy 5525 group.
 
 
 4
 The School District enacted Policy 5525 in June 1994 in an attempt to comply with the Equal Access Act. Modeled on section 4071(c) of the Act, the policy authorizes student sponsored and initiated student groups to meet at the school, subject to approval by the principal. The policy provides for approval, so long as the groups 1) remain voluntary and student initiated; 2) are not sponsored by the school or its staff; 3) hold meetings that do not materially and substantially interfere with the orderly operation of the school; 4) require that students, rather than outsiders, are responsible for the direction, control, and conduct of the meetings; 5) do not require students to participate in any religious activity; 6) do not use school funds for other than incidental and/or monitoring costs; 7) do not compel any staff member to attend; and 8) respect the constitutional rights of all persons. Policy 5525 clubs are not entitled to the same benefits as ASB clubs.
 
 
 5
 Prince claims that by denying the World Changers access to the same benefits as ASB groups, the School District denies her equal access to this forum in violation of the Act. These benefits include access to ASB money to fund club activities, as well as free participation in ASB fund-raising events such as the annual craft fair, the school auction, and other fund-raising events. Likewise, ASB groups appear in the school yearbook, produced with ASB funds, free of charge and are permitted to meet during student/staff time during school hours. ASB groups also receive greater access to facilities to publicize their events, including the right to post flyers throughout the school, rather than on a single bulletin board, and the use of the public address system. Finally, ASB groups benefit from the expenditure of School District funds as they may use school supplies, have priority access to audio/visual equipment, and use school vehicles for field trips.
 
 
 6
 The School District maintains that while Prince is welcome to form the World Changers as a Policy 5525 group, granting the World Changers equal status with ASB groups would "destroy the careful balance between the Free Speech and Establishment clauses of the First Amendment" found in the Act. Specifically, because the ASB regulations increase School District scrutiny of the budget, constitution, bylaws, fund-raising, and activities of ASB groups, granting ASB status to religious clubs would result in excessive entanglement between the state and religion, and would attach the school's imprimatur to the club in violation of the Establishment Clause. Moreover, the School District contends that by creating two separate forums, the Policy 5525 forum and the ASB forum, it avoids viewpoint discrimination in violation of the First Amendment.
 
 
 7
 In ruling for the School District, the district court first determined that the Act does not require absolute equality of student groups; thus, the School District's distinction between ASB groups and Policy 5525 groups did not violate it. The court also found that the school was a "nonpublic" forum and, accordingly, the School District's distinction between ASB and Policy 5525 groups neither violated Prince's rights to free speech or the free exercise of religion under the First Amendment. Finally, because the nonpublic nature of the school forum did not implicate fundamental rights of freedom of speech or exercise of religion, the School District policy did not violate the Equal Protection Clause of the Fourteenth Amendment.
 
 II. Standard of Review
 
 8
 We review de novo a grant of summary judgment. We must determine whether, viewing the evidence in the light most favorable to Prince, there are any genuine issues of material fact and whether the district court correctly applied the substantive law. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc).
 
 III. The Equal Access Act
 
 9
 A. Three Distinctions in the Act: Equal Access, Fair Opportunity, and Discrimination
 
 
 10
 The Equal Access Act, 20 U.S.C. §§ 4071-74 (1984), guarantees public secondary school students the right to participate voluntarily in extracurricular groups dedicated to religious, political, or philosophical expressive activity protected by the First Amendment when other student groups are given this right. The impetus for its enactment in Congress was anecdotal evidence that secondary school students suffered discrimination at the hands of school administrators, sanctioned by federal district courts, who believed that the First Amendment precluded equal access for religious student groups to the public school. See, e.g., 130 Cong. Rec. S8331 (daily ed. June 27, 1984) (statement of Sen. Hatch). The Act was designed to transport the right of equal access to religious activities to limited open forums established with respect to college level students in Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), to the secondary school level. The Supreme Court upheld the Act's constitutionality against Establishment Clause challenges in Board of Education v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). The key provision of the Act provides:
 
 
 11
 It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.
 
 
 12
 20 U.S.C. § 4071(a) (2000).
 
 
 13
 The Act sets forth certain "triggers" for its applicability. It applies only if the school in question is (1) a public secondary school that (2) receives federal funding, and (3) has established a "limited open forum" by allowing other "non-curriculum" groups to meet on school premises. Spanaway Lake High School is a public high school that receives federal funding. The parties stipulate that Spanaway has created a "limited open forum" under the Act and that the Bible Club is a "non-curriculum" group. Therefore, as both sides agree, the Act is "triggered" in this case.
 
 
 14
 Left to us to decide is whether the School District's refusal to afford World Changers and other Policy 5525 groups the same benefits afforded ASB groups denies "equal access or a fair opportunity to, or discriminates against," Prince and World Changers. Prince argues that the Act mandates that religious groups such as World Changers be afforded all the same benefits afforded other groups. Specifically, she contends that the terms "equal access" and "discriminate," interpreted in light of the Act's statutory purpose, suggest that the Act requires absolute equality between religious and non-religious groups. The School District contends that the addition of the phrase "fair opportunity" to the requirements of the Act suggests that uniform access to the ASB forum is not required, as long as a "fair opportunity" for access is provided.
 
 
 15
 Our analysis of the Act begins with its language. Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). "In matters of statutory construction [our] duty ... is to give effect to the intent of Congress, and in doing so our first reference is of course to the literal meaning of words employed." Flora v. United States, 357 U.S. 63, 65, 78 S.Ct. 1079, 2 L.Ed.2d 1165 (1958). Where the intent of Congress "has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (internal quotation marks omitted); United States v. Am. Trucking Ass'ns., Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes."). Our job is to ascertain what Congress has written, not "to add [or] to subtract, ... to delete [or] to distort," 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States, 340 U.S. 593, 596, 71 S.Ct. 515, 95 L.Ed. 566 (1951), and "to avoid rendering what Congress has plainly done... devoid of reason and effect." Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 122 S.Ct. 708, 717, 151 L.Ed.2d 635 (2002).
 
 
 16
 Although revised many times, as enacted, section 4071, entitled "Denial of Equal Access Prohibited," begins by making unlawful the denial of "equal access" or "fair opportunity" or discrimination against students desiring to conduct a meeting in a "limited open forum" on the basis of the "religious, political, philosophical, or other content of the speech at such meetings." It then defines some, but not all, of the terms set forth in the prohibition, including "limited open forum," § 4071(b), and "fair opportunity criteria," § 4071(c). It does not set forth a definition of the terms "equal access" or "discriminate against." Next, the Act limits the authority of the school board in section 4071(d). In section 4072, Congress further defines the terms "secondary school," § 4072(1), "sponsorship," § 4072(2), "meeting," § 4072(3), and "non-instructional time," § 4072(4).
 
 
 17
 The disjunctive prohibition renders the denial of equal access or fair opportunity or discrimination unlawful. The use of the disjunctive "or" suggests that "equal access" and "discriminate against" have meaning independent of "fair opportunity." "The cardinal principle of statutory construction is to save and not destroy. It is our duty to give effect, if possible, to every clause and word of a statute." United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (internal quotation marks and citations omitted).
 
 
 18
 Although the Act does not specify the meaning of the terms "equal access" and "discriminate against," Congress did not need to do so. We presume that Congress, in enacting the Act, was aware of the settled judicial construction of these phrases. See Pierce v. Underwood, 487 U.S. 552, 567, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (citing Lorillard v. Pons, 434 U.S. 575, 580-81, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)). "In adopting the language used in the ... [A]ct, Congress must be considered to have adopted also the construction given by this Court to such language, and made it a part of the enactment." Shapiro v. United States, 335 U.S. 1, 16, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); see also South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 351, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998) (Supreme Court assumes that Congress is aware of existing law when it passes legislation).
 
 
 19
 As the legislative history of the Act spells out quite clearly, the Act was written to enact the policy of equal access and nondiscrimination against religious speech enunciated by the Court in Widmar, 454 U.S. at 267-71, 102 S.Ct. 269. S.Rep. No. 98-357, at 38-39 (1984), reprinted in 1984 U.S.C.C.A.N. 2348, 2384-85.[1] As explained in the Senate Report:
 
 
 20
 The standard of `equal access' was used by the Supreme Court in Widmar v. Vincent, to describe the free speech principle safeguarded by Section 2(a). In Section 2(a), as in the Supreme Court decision, the guarantee of equal access means that religiously oriented student activities of an extracurricular nature would be allowed under the same terms and conditions as other extracurricular activities. Under Section 2(a), it would be unlawful to single out a voluntary student religious activity for discriminatory treatment based on the fact that the form or content of its expression is religious. The opportunity for an extracurricular religious group to meet and have access to public school facilities could not be restricted solely because the activity included religious speech or prayer. This provision follows the Supreme Court decision in Widmar v. Vincent, which held that religious speech is entitled to the same First Amendment protections as non-religious speech.
 
 
 21
 Id. at 38-39. Thus, the term "equal access" means what the Supreme Court said in Widmar: religiously-oriented student activities must be allowed under the same terms and conditions as other extracurricular activities, once the secondary school has established a limited open forum. Widmar, 454 U.S. at 267-71, 102 S.Ct. 269.
 
 
 22
 The legislative history also sheds light on the term "discrimination." The Senate Judiciary report states that "discrimination" includes the denial of permission for students to engage in voluntary extracurricular activities that include prayer or religious speech when a school permits students to meet for non-religious extracurricular speech. S.Rep. No. 98-357, at 39. It also notes that discriminatory actions in the form of harassment or unequal penalties, as well as clearcut denial, constitute a violation of the law. Id. The report clarifies that Congress did not intend the terms "equal access," "discrimination," and "fair opportunity" to have the same meaning, by recognizing distinctions in the type of proof each term would require. It acknowledges that proof of discrimination under current law could require proof of a discriminatory motive on the part of the school district, but that such a higher standard of proof would not be necessary to show denial of "access and opportunity" in violation of the Act. Id. ("The motive of the school, which could be important to a finding of discrimination, is not therefore decisive in determining whether there has been a denial of equal access and opportunity in violation of section 2(a).").
 
 
 23
 Nothing in the Act suggests that Congress meant to use these words as synonyms. The School District and the district court's restrictive reading of the Act to require only "fair opportunity" renders superfluous the words "equal access" and "discrimination" in Section 4071(a). They would read "equal access" and "discrimination" right out of the Act, making what "Congress has plainly done ... devoid of reason and effect." Great-West Life, 122 S.Ct. at 717.
 
 
 24
 Moreover, the Act's outline of the "fair opportunity" criteria does not address the School District's affirmative obligations regarding "equal access" and "discrimination," but rather circumscribes what the school may do. This provision was included to avoid excess entanglement with religion, so that the Act would withstand an Establishment Clause challenge. See Gibbons, supra note 1, at 1164-65. Under the Act, a school "shall be deemed to offer a fair opportunity to students who wish to conduct a meeting within its limited open forum" if the school "uniformly" provides that:
 
 
 25
 (1) the meeting is voluntary and student-initiated;
 
 
 26
 (2) there is no sponsorship of the meeting by the school, the government, or its agents or employees;
 
 
 27
 (3) employees or agents of the school or government are present at religious meetings only in a nonparticipatory capacity;
 
 
 28
 (4) the meeting does not materially and substantially interfere with the orderly conduct of educational activities within the school; and (5) nonschool persons may not direct, conduct, control, or regularly attend activities of student groups.
 
 
 29
 20 U.S.C. § 4071(c).
 
 
 30
 If the School District went beyond the limits of section 4071(c), its activities could be deemed to violate the Establishment Clause. For example, if a public school required student participation in or itself participated in or sponsored religious meetings on the high school campus, it would bump squarely into Establishment Clause jurisprudence prohibiting such government sponsorship of religion. See McCollum v. Bd. of Ed., 333 U.S. 203, 209-11, 68 S.Ct. 461, 92 L.Ed. 649 (1948). Likewise, the school retains the authority to prohibit meetings that would materially or substantially interfere with the orderly conduct of educational activities within the school. See Tinker v. Des Moines Indep. Comm. Sch. Dist., 393 U.S. 503, 509, 513, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Thus, merely meeting the criteria for "fair opportunity" could not possibly satisfy the affirmative requirements of equal access and non-discrimination. Similarly, section 4071(d), which, among other things, prevents the School District from influencing and requiring participation in the religious activity, limits the authority of the school board within the constitutional orbit.
 
 
 31
 The Supreme Court's interpretation of the Act in Mergens, where it grappled with a similar question, supports our conclusion. 496 U.S. at 248, 110 S.Ct. 2356. There, a group of students requested permission to form a Christian club at the school, whose purpose would have been, among other things, to permit the students to read and discuss the Bible, to have fellowship, and to pray together. Id. at 232, 110 S.Ct. 2356. The school board denied outright Mergens's request for official recognition. It reasoned that if the student religious meetings were held under the school's aegis and the state compulsory attendance laws brought students together, thus providing an audience for student evangelists, an objective observer would perceive official school support for the meetings. Id. at 249, 110 S.Ct. 2356. Instead, the school board allowed the Christian group only to meet informally on the school premises after school. The Supreme Court disagreed with the school district's reasoning, noting that the logic of Widmar applied with equal force to the Act: "the purpose of granting equal access is to prohibit discrimination between religious or political clubs on the one hand and other noncurriculum-related student groups on the other." Id. at 238, 110 S.Ct. 2356. The Court held that "[o]fficial recognition [by the school] allows student clubs to be part of the student activities program and carries with it access to the school newspaper, bulletin boards, the public address system, and the annual Club Fair." Id. at 247, 110 S.Ct. 2356. Denying the Christian club those same benefits was a denial of "equal access," not just "fair opportunity," under the Act. Id. Similarly here, we must reject the School District's contention that providing "fair opportunity" is sufficient to provide "equal access."
 
 
 32
 We find this interpretation consistent with the overall legislative purpose behind the Act. The Supreme Court has stressed repeatedly that "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (quoting United States v. Heirs of Boisdore, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1850)). The object of Congress in enacting the Act was "to prohibit discrimination between religious and political clubs on the one hand and other noncurriculum-related student groups on the other...." See Mergens, 496 U.S. at 238, 110 S.Ct. 2356. The Act, "which was passed by wide, bipartisan majorities in both the House and the Senate, reflects at least some consensus on a broad legislative purpose. The Committee Reports indicate that the Act was intended to address perceived widespread discrimination against religious speech in public schools...." Id at 239, 110 S.Ct. 2356. (citing H.R.Rep. No. 98-710, at 4 (1984), S.Rep. No. 98-357, at 10-11 (1984)). Accordingly, a "broad reading of the Act would be consistent with the views of those who sought to end discrimination by allowing students to meet and discuss religion before and after classes." Id. We therefore reject the School District's claim that even if it provided fair opportunity to the World Changers, it need not provide equal access.
 
 
 33
 B. "Sponsorship" of a Religious Organization
 
 
 34
 The School District also argues that Washington State regulations require such substantial control over the activities of ASB clubs that granting ASB status to a religious student group would result in prohibited "sponsorship" of that group in violation of the Act and the Establishment Clause. Washington State regulations provide that a student group be "formed with the approval, and operated subject to the control, of the board of directors of a school district" to secure ASB status. Wash. Admin. Code § 392-138-010(1) (1999). They also require each ASB organization to "submit a financial plan (budget)... to the district superintendent ... for consolidation into a district associated student body program fund budget and then present such budget to the board of directors of the district for review, revision, and approval." Wash. Admin. Code § 392-138-040 (1999). The School District contends that because it is bound by these regulations, it cannot grant a religious group ASB status without "sponsoring" that group. This argument fails on a number of grounds.
 
 
 35
 First, the regulations in question do not require "sponsorship" as defined in the Act. Section 4072(2) defines "sponsorship" to include "promoting, leading, or participating in a meeting." 20 U.S.C. § 4072(2) (emphasis added). "Meeting" is defined to "include[] those activities of student groups which are permitted under a school's limited open forum." 20 U.S.C. § 4072(3). The regulations cited by the School District do not require that the district promote, lead, or participate in any World Changers meeting in any way.
 
 
 36
 Second, the School District offers an overbroad reading of the regulations to support its contention that conferring ASB status on religious groups would result in unlawful "sponsorship" of the club. Importantly, the regulations define "[a]ssociated student body organization" as a "formal organization of students, including subcomponents or affiliated student groups such as student clubs, which is formed with the approval, and operated subject to the control, of the board of directors of a school district." Wash. Admin. Code § 392-138-010(1) (1999). Nowhere do the regulations state that the School District itself approves the constitution and bylaws of each affiliated club. As the Spanaway Lake High School principal admitted in his deposition, it is the student council that approves the constitution and bylaws of each student group. As to the student budget, regulations provide that it is the "associated student body," not each individual student club, which must submit a budget to the district superintendent who then consolidates that budget into a district-wide student budget. The school board reviews, revises, and approves the district-wide student budget. Again, it is the student council that approves each individual group's budget.
 
 
 37
 The Washington State regulations thus require only limited involvement by the School District in the particular activities of ASB groups. They certainly do not require that the District "promote" the World Changers, "lead" it, or "participate" in its activities. Similar procedures were addressed by the Supreme Court in Mergens. There, although there was no written school board policy, students who wished to form a club presented their request to a school official who determined whether the proposed club's goals and objectives were consistent with school board policies and with the school district's "Missions and Goals." Mergens, 496 U.S. at 232, 110 S.Ct. 2356 (describing a broadly worded document that expressed the school district's commitment to academic, physical, civic, and personal skills and values). Like the Supreme Court in Mergens, we reject the argument that simply because of a limited approval and oversight process by the district, the district impermissibly sponsors the club within the meaning of the Act or as proscribed by the First Amendment. At most, Washington State regulations require that the School District "[r]etain and exercise the general powers, authority, and duties expressed in law with respect to the administration of the school district." Wash. Admin. Code § 392-138-030(1) (1999). That sort of involvement is recognized by the Act: "Nothing in this subchapter shall be construed to limit the authority of the school... to maintain order and discipline on school premises, to protect the well-being of students and faculty, and to assure that attendance of students at meetings is voluntary." 20 § U.S.C. 4071(f). Because we are obligated to construe a state statute as valid, where possible, Lorillard, 434 U.S. at 577, 98 S.Ct. 866, we cannot agree that the regulations are inconsistent with the Act.
 
 
 38
 Even if these regulations were construed to require the School District to "sponsor" student clubs, however, they could not shield the School District's violation of the Act. Under the Act, once the School District establishes a "limited open forum," it must provide the World Changers with equal access to that forum. If state regulations did require the School District to "sponsor" the club as prohibited by the Act, then it is the regulations that must give way, not the District's obligation to provide equal access. The rationale of Garnett v. Renton School District, 987 F.2d 641 (9th Cir.1993), compels this conclusion. There, Washington State argued that despite creating a limited open forum within the school district for noncurriculum-related clubs to meet, the Washington State Constitution precluded the Act from requiring the use of school premises by a religious club. We disagreed, holding that the Washington State Constitution's Establishment Clause did not absolve school districts of their obligations under the Act: "state[s] cannot abridge rights granted by federal law.... The EAA provides religious student groups a federal right. State law must therefore yield." Garnett, 987 F.2d at 646 (citations omitted). If the Washington State Constitution must yield to the Act, then so too must the state's administrative regulations. We must, therefore, examine each of the specific benefits requested by the World Changers to determine whether Prince and her group are entitled to access equal to that given ASB groups under the Act.
 
 C. Individual Access Claims under the Act
 
 39
 1. Access to ASB funding, including participation in the craft fair, school auction, and fund-raising during the school day
 
 
 40
 The Act prohibits school districts from "expend[ing] public funds beyond the incidental cost of providing the space for student-initiated meetings." 20 U.S.C. § 4071(d)(3). The School District argues that the use of ASB funds, including participating in the annual craft fair free of charge, fund-raising during the school day, and participating in the school auction, each require the expenditure of public funds and thus are prohibited by the Act. That the School District classifies ASB funds as "public funds" is irrelevant for the purposes of construing the Act. See Garnett, 987 F.2d at 644-46 (finding that the Equal Access Act preempts state law). Rather, we must examine the precise nature of the ASB program funds and determine, according to the broad purpose of the Act and analogous interpretations of federal law, whether those funds are "public."
 
 
 41
 The ASB funds at issue are accounted for separately from general School District funds. They are not commingled. No School District funds are allocated to an ASB account. The funds are generated from the sale of ASB cards, which cost $20 and entitle the holder to participate in school sports and to receive discounts at ASB events such as sporting events and dances. Payment for the cards is voluntary. ASB clubs also raise funds by selling crafts in the annual craft fair, participating in an ASB auction, and through other fund-raising activities, such as candy sales and car washes, ongoing throughout the school year.
 
 
 42
 Although Policy 5525 clubs may participate in the craft fair, they must pay a $60 fee. They are prohibited from participating in the auction, and from fund-raising during the school day or at any other time that would compete with ASB fund-raising. ASB clubs access ASB funds by submitting purchase order requests to pay activity expenses such as transportation, lodging, and registration fees.
 
 
 43
 Although the Act does not define the phrase "expend public funds," the Supreme Court's decision in Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), provides a useful starting point for our analysis. While Rosenberger involves the Establishment Clause of the First Amendment, rather than the Act, the Act was drafted against the background protections of the Establishment and Free Exercise Clauses. Mergens, 496 U.S. at 259, 110 S.Ct. 2356 (Kennedy, J., concurring). Similarly, like the other limitations on School District activity contained in the Act, section 4071(d)'s statement that the Act does not authorize schools to "expend public funds" on religious groups appears to be intended to avoid Establishment Clause issues. Indeed, had the Act actually authorized schools to "expend public funds" on religious groups, it could have run afoul of a long line of Establishment Clause decisions forbidding direct subsidies to religious groups. See Rosenberger, 515 U.S. at 842, 115 S.Ct. 2510 (collecting cases). Accordingly, we look to Rosenberger to guide our reasoning.
 
 
 44
 In Rosenberger, the school imposed activities fees on students, maintained those fees, kept them separate from general university funds, and then allowed groups of students to apply for their use. Id. at 841, 115 S.Ct. 2510. The Court emphasized that the
 
 
 45
 $14 paid each semester by the students is not a general tax designed to raise revenue for the University ....[T]he money goes to a special fund from which any group of students with CIO status can draw for purposes consistent with the University's educational mission; and to the extent the student is interested in speech, withdrawal is permitted to cover the whole spectrum of speech, whether it manifests a religious view, an antireligious view, or neither. Our decision, then, cannot be read as addressing an expenditure from a general tax fund. Here, the disbursements from the fund go to private contractors for the cost of printing that which is protected under the Speech Clause of the First Amendment. This is a far cry from a general public assessment designed to provide financial support for a church.
 
 
 46
 Id. (citing United States v. Butler, 297 U.S. 1, 61, 56 S.Ct. 312, 80 L.Ed. 477 (1936), for the proposition that a "tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the Government").
 
 
 47
 As in Rosenberger, the ASB funds here subsidize club expenditures consistent with Spanaway Lake High School's educational mission. In light of Rosenberger, we hold that the ASB funds do not constitute "public funds" for purposes of the Act. The School District discriminates against Prince and the World Changers by denying them equal access to those funds. The School District also unlawfully discriminates against the World Changers, based on their viewpoint, when it prohibits them from engaging in or charges them to participate in other fund-raising activities, including the auction and the craft fair, on an equal basis with other ASB groups.
 
 2. Free appearance in yearbook
 
 48
 Nor can the School District justify charging Policy 5525 groups for appearance in the yearbook on the basis that the yearbook is subsidized by public funds, as it contends. Because the ASB funds are not "public funds" as defined in the Act, the School District denies equal access to Policy 5525 clubs by charging them advertising fees to appear in the school yearbook, which is produced with ASB funds. Again, as in Rosenberger, the disbursements from the fund for club photographs go to the yearbook vendors, not the individual clubs, and its purpose is consistent with the school's educational mission. It is unlawful viewpoint discrimination under the Act for the school to allow ASB clubs to appear in the yearbook free of charge, but to require Policy 5525 clubs to pay.
 
 
 49
 3. Use of the public address system and school bulletin boards
 
 
 50
 The School District argues that no club, ASB or Policy 5525, has a right to use the public address system and that all clubs, including Policy 5525 clubs, are allowed access to school bulletin boards. Prince asserts that in practice, ASB clubs have been allowed to use the public address system and to post flyers throughout the school, unlike Policy 5525 clubs, which are restricted to the use of only one bulletin board. While these factual matters are best left for resolution in the district court, we hold that the Act requires the School District to afford the World Changers the same access to the public address system and bulletin boards enjoyed by ASB groups to publicize their activities.
 
 
 51
 In Mergens, the Supreme Court considered the right of religious clubs to publicize their events on an equal basis with other officially recognized school clubs. It held that the Act required equal access to the school's limited open forum in the form of official recognition, which included access to the school newspaper, bulletin boards, and the public address system. See Mergens, 496 U.S. at 247, 110 S.Ct. 2356. Here, as in Mergens, equal access to the school forum includes access to the use of more than one bulletin board and the public address system to publicize club activities. There is no qualification in the Act or in Mergens that would allow the school to limit bulletin board space based on the religious nature of the activity. Access to such space must be "equal." Likewise, to the extent that the school allows ASB clubs to announce meeting times or events over the public address system, it cannot then discriminate against Policy 5525 clubs that seek the same privilege. While the school is certainly permitted to maintain order and discipline in the school hallways and classrooms by limiting the number and manner of both printed and oral announcements for all student groups, 20 U.S.C. § 4071(f), it may not discriminate among student groups based on the religious content of the expression or proposed meeting. This is not to say that World Changers has the right to pray or proselytize in any manner through the school's public dissemination systems. Nonetheless, the logic of Mergens compels equal access to publicize Policy 5525 club events. See Mergens, 496 U.S. at 247, 110 S.Ct. 2356.
 
 4. Meetings during student/staff time
 
 52
 The School District contends that because attendance is taken and instruction may occur in the classroom during student/staff time at Spanaway Lake High School, student/ staff time does not qualify as noninstructional time and the School District may not permit Policy 5525 groups to meet during this time. The Act provides that a school's limited open forum extends to whenever groups are permitted to meet "on school premises during noninstructional time." 20 U.S.C. § 4071(b). We have already held that the plain meaning of "noninstructional time" is defined unambiguously in the statute as the "time set aside by the school before actual classroom instruction begins or after actual classroom instruction ends." Ceniceros v. Board of Trustees, 106 F.3d 878, 880 (9th Cir.1997) (holding that there is no need to rely on the legislative history to come to this conclusion because there was no ambiguity in the language of the statute). However, we have not yet fully delineated the contours of the statutory term "actual classroom instruction."
 
 
 53
 At Spanaway Lake High, student/staff time is a scheduled class where attendance is taken, and where no formal classroom instruction takes place, except on a voluntary, individual basis. During this time, a student may work on homework, receive one-on-one tutoring with a teacher, attend school assemblies, or, with prior arrangement and scheduling, participate in a student club meeting. Students are not permitted to leave campus, and attendance is taken.
 
 
 54
 Prince argues that Ceniceros requires us to find that the Act mandates equal access to student/staff time for the World Changers. In Ceniceros, the public high school allowed noncurriculum-related clubs to meet during the lunch period in empty classrooms, but denied the same opportunity to a religious club. Ceniceros 106 F.3d at 880. Relying on the parties' stipulation that "no classroom instruction occurs" during the school's lunch hour and that students were not required to remain on campus during the lunch hour, we concluded that the "plain meaning of `noninstructional time,' as defined in section 4072(4), includes the lunch period." Id.
 
 
 55
 We do not view Ceniceros as controlling, because there are significant differences between the lunch hour and the scheduled student/staff time here. Although, as in Ceniceros, the School District concedes that no "formal" instruction takes place during student/staff time, it does not concede that no "actual classroom instruction" takes place, nor can it, given that students may receive individual instruction in the classroom during this time. The statute is ambiguous as to whether "actual classroom instruction" means something akin to formal instruction given to an entire class during a structured period or whether it encompasses instruction in a class room where mandatory attendance is required. Because the text is ambiguous, it is necessary to turn to the legislative history. See Ram v. INS, 243 F.3d 510, 515 (9th Cir. 2001).
 
 
 56
 The legislative history makes clear that once student attendance is required, "actual classroom instruction" begins. The Congressional debates between Senator Hatfield, the author of relevant amendments to the Act, and Senator Metzenbaum illustrate this point:
 
 
 57
 Sen. Metzenbaum: If there is a homeroom session at the beginning of the day, that would be considered as part of the actual classroom instructional day?
 
 
 58
 Sen. Hatfield: I think most schools will make an interpretation of that, according to my experience in education, as to the required time to be in school. If a school is to begin at 9 o'clock, that is the required hour for students to begin their day. They do not open with geography or mathematics or something, but they open with a homeroom period of 20 minutes, when they get instructions, announcements, and so forth and so on. They are still required to be there at 9 o'clock. So you could not hold an activity of this kind at 9 o'clock until 9:20 because it is a preinstructional period, in that sense, because it is required of the instructional period to begin at 9 o'clock. Sen. Metzenbaum: So you could not hold it during that period?
 
 
 59
 Sen. Hatfield: That is right.
 
 
 60
 130 Cong. Rec. at 19234-35.
 
 
 61
 The conclusion that mandatory attendance marks the beginning of "actual classroom instruction" is supported by revisions made to earlier versions of the Act that would have encompassed certain class periods during the school day. See S. 1059, 98th Cong. (1983); H.R. 5345, 98th Cong. (1983); see also, e.g., 130 Cong. Rec. 20933 (statement of Rep. Frank) ("The original bill would have given the force of law to the right of students to meet during the school day. The bill we have before us now deals with before school and after school. As to during the school day, that is left up to the local schools to do as they wish."). Consistent with this understanding of the bill's evolution, numerous members of Congress made clear in the floor debate that they opposed the earlier version of the bill because it would have reached activities periods during the school day, but that they supported the bill as passed precisely because it did not.[2] Other members of Congress who supported both the original and revised language also expressed their definite understanding that the final version, unlike the earlier one, applies only before and after the school day.[3] Statements that could be read to the contrary tended to be rather vague on the issue, came few and far between, and were made by members of Congress who either did not support the legislation at all or opposed the revision of the bill to its current version.[4] See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council, 485 U.S. 568, 585, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) ("The views of opponents of a bill with respect to its meaning... are not persuasive.... It is the sponsors that we look to when the meaning of the statutory words is in doubt.") In light of the legislative history, we conclude that the Act cannot be read to require the School District to allow the World Changers to meet during student/ staff time.
 
 
 62
 5. Use of school supplies, audio/visual equipment, and school vehicles
 
 
 63
 The School District also argues that allowing Policy 5525 clubs equal access to supplies, audio/visual ("AV") equipment, and school vehicles would result in the unlawful "expenditure of public funds beyond the incidental cost of providing the space for student-initiated meetings" in contravention of § 4071(d)(3) of the Act. Unlike access to the fund-raising activities and the yearbook, use of school supplies, AV equipment, and school vehicles does involve the "expend[iture of] public funds" because School District funds, rather than ASB funds, are used to purchase and maintain the equipment. Accordingly, if funds for this equipment exceed the incidental cost of providing "space" for student-initiated "meetings," it is not authorized under the Act. Again, we look to the plain language of the Act. The term "meeting" is defined to include "those activities of student groups which are permitted under a school's limited open forum and are not directly related to the school curriculum." 20 U.S.C. § 4072(3). We agree that interpreting the term "space" to include access to school supplies, AV equipment, and vehicles, would stretch the term too far. Although basic additional elements, such as chairs, lighting, or desks, may be encompassed in the term, the Act does not compel the school to provide these additional supplies and equipment to Prince.
 
 
 64
 Because we hold that access to ASB funding, the yearbook, the public address system, and the bulletin boards is required by the Act, while the Act does not similarly encompass Prince's request for access to student/staff time, school supplies, vehicles, or AV equipment, we must determine whether the First Amendment requires a different result as to the latter.
 
 
 65
 IV. Individual Access Claims under the First Amendment
 
 
 66
 We reach the constitutional question only as to those access claims not covered by the Act. The Act is not to be construed to authorize the states "to abridge the constitutional rights of any person." 20 U.S.C. § 4071(d)(7). While the Act was an attempt to codify and clarify the Supreme Court's decisions on the First Amendment rights of students, First Amendment jurisprudence has continued to evolve since the Act was passed in 1984. We do not read the Act to designate the outer limits of state compliance with the First Amendment. Therefore, we must consider whether the Bethel School District violates Prince's First Amendment rights by denying the World Changers access to student/staff time, supplies, AV equipment, and school vehicles. We first address whether the school's admittedly discriminatory policy violates Prince's right to free speech and, if so, whether the violation is excused by the Establishment Clause's prohibitions.
 
 A. The Free Speech Clause
 
 67
 The School District, having offered ASB clubs access to student/staff time, school supplies, AV equipment, and school vehicles to convey their club messages, violated the free speech clause by excluding the Policy 5525 clubs from access to the same benefits. In Widmar, the Supreme Court declared unconstitutional a university's policy of preventing student groups from using school facilities for religious worship or discussion. Widmar, 454 U.S. at 267, 102 S.Ct. 269. The Court held that "[t]hrough its policy of accommodating their meetings, the University has created a forum generally open for use by student groups. Having done so, the University has assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms." Id.; see also Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (noting that school facilities may be deemed to be public forums if school authorities have "by policy or by practice" opened those facilities to some segment of the public, including student organizations); cf. Mergens, 496 U.S. at 242, 110 S.Ct. 2356 (noting that Congress's deliberate choice to use and define the term "limited open forum" in the Act meant that it intended to establish a standard different from the "limited public forum" used in free speech cases). By discriminating against students groups based on their desire to use a generally open forum to engage in religious worship and discussion, the university discriminated against them on forms of speech and association protected by the First Amendment. Id. at 269, 110 S.Ct. 2356. "[T]o justify discriminatory exclusion from a public forum based on the religious content of a group's intended speech, the University... must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Widmar, 454 U.S. at 269-70, 102 S.Ct. 269.
 
 
 68
 As in Widmar, Spanaway Lake High School has created a limited public forum in which student groups are free to meet during student/staff time, as well as to use school vehicles for field trips, to have priority for use of the AV equipment, and to use school supplies such as markers, posterboard, and paper. While certainly not required to grant student clubs access to these benefits, the school has chosen to do so. Having done so, it cannot deny access to some student groups because of their desire to exercise their First Amendment rights without a compelling government interest that is narrowly drawn to achieve that end. Id. at 269, 102 S.Ct. 269; see also Good News Club v. Milford Cent. Sch., 533 U.S. 98, 121 S.Ct. 2093, 2099-2100, 150 L.Ed.2d 151 (2001) (noting that the State's restrictions on speech are subject to stricter scrutiny in traditional or open public forums, than are restrictions in a limited public forum); Davey v. Locke, 299 F.3d 748, 756 (9th Cir.2002) ("Once [the government] opens a neutral `forum' (fiscal or physical), with secular criteria, the benefits may not be denied on account of religion.").
 
 
 69
 Moreover, even if we held that the ASB forum was not an open forum, as the School District argues, the State does not have unlimited power to restrict speech. Widmar, 454 U.S. at 269, 102 S.Ct. 269. Under the more lenient restrictions of a closed forum, the distinctions drawn over access to the forum must continue to be "reasonable in light of the purpose served by the forum" and viewpoint neutral. Cornelius v. NAACP, 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). "Discrimination against speech because of its message is presumed to be unconstitutional." Rosenberger, 515 U.S. at 828, 115 S.Ct. 2510. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Id. at 829, 115 S.Ct. 2510; see also Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 392-94, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (finding that it was viewpoint discrimination to prohibit a film exhibit that addressed family values from a religious viewpoint).
 
 
 70
 The School District's restriction on access to facilities is based purely on the World Changer's religious viewpoint in violation of the First Amendment. The purpose of the ASB forum created by the School District is broad, recognizing groups that engage in "any lawful activity which promotes the academic, vocational, personal, or social/civil/cultural growth of students." The World Changers club has a similar purpose: "to teach students leadership and responsibility through the teaching of Jesus Christ and the Bible," "to facilitate the spiritual growth of its student members," and "to support the community of Spanaway through various charity events, volunteer activity, and various other philanthropic activities." Like the church in Lamb's Chapel, the World Changers seeks to address a subject otherwise permitted under this forum, the teaching of personal, social, civil and cultural growth, from a religious standpoint. See Good News, 121 S.Ct. at 2101. That these more secular goals are pursued through a religious perspective or religious means cannot form the basis of excluding them from the ASB forum. See, e.g., id. (holding that denying access to school facilities to Bible club that sought to teach "morals and character" from an evangelical religious perspective was viewpoint discrimination); Rosenberger, 515 U.S. at 831, 115 S.Ct. 2510 (holding that refusing student funds to a newspaper that wrote from a religious perspective was viewpoint discrimination); Lamb's Chapel, 508 U.S. at 393-94, 113 S.Ct. 2141 (1993) (finding that it was viewpoint discrimination to prohibit use of school facilities for a film exhibit that addressed family values from a religious viewpoint). Accordingly, the reasoning invoked by the School District to deny World Changers equal access to student/staff time, school supplies, AV equipment, and school vehicles cannot be sustained under the free speech clause.
 
 B. The Establishment Clause
 
 71
 The School District argues that it cannot allow Policy 5525 groups access to the same benefits as ASB groups without violating the Establishment Clause. A significant factor in evaluating whether a governmental program violates the Establishment Clause is its neutrality toward religion. Rosenberger, 515 U.S. at 839, 115 S.Ct. 2510; see also Good News, 121 S.Ct. at 2104, 121 S.Ct. 2093 ("Because allowing the Club to speak on school grounds would ensure neutrality, not threaten it, [the school district] faces an uphill battle in arguing that the Establishment Clause compels it to exclude the Good News Club."). Like the Good News Club, the World Changers seek nothing more than to be treated neutrally and given access to speak about the same topics as other groups. Id. There is no question that requiring that the School District grant religious groups access to the ASB forum would ensure neutrality.
 
 
 72
 Our analysis is not altered by the possibility that these funds may be used to subsidize devotional exercises. "It does not violate the Establishment Clause for a public[school] to grant access to its facilities on a religion-neutral basis to a wide spectrum of student groups, including groups that use meeting rooms for sectarian activities, accompanied by some devotional exercises." Rosenberger, 515 U.S. at 842, 115 S.Ct. 2510. "This is so even where the upkeep, maintenance, and repair of the facilities attributed to those uses are paid from a student activities fund to which students are required to contribute." Id. at 842-43, 115 S.Ct. 2510. As in Rosenberger, we are not confronting a case where the government is making direct money payments to an institution or group engaged in religious activity. Id. at 842, 115 S.Ct. 2510. Providing meeting space during student/staff time, school supplies and bus transportation is not a direct payment to the World Changer's coffers, even though it may facilitate the World Changer's own religious speech. "If the expenditure of governmental funds is prohibited whenever those funds pay for a service that is, pursuant to a religion-neutral program, used by a group for sectarian purposes, then Widmar, Mergens, and Lamb's Chapel would have to be overruled." Id. at 843, 115 S.Ct. 2510. "Any benefit to religion is incidental to the government's provision of secular services for secular purposes on a religion-neutral basis." Id. at 843-44, 115 S.Ct. 2510.
 
 
 73
 Our focus on the criteria used to distribute funds that may benefit a religious group differs from those cases in which government programs have provided aid directly to religious schools. Zelman v. Simmons-Harris, ___ U.S. ___, ___, 122 S.Ct. 2460, 2465, 153 L.Ed.2d 604 (2002); Mitchell v. Helms, 530 U.S. 793, 810-14, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurality opinion). In cases involving direct aid to parochial schools, there is a risk that the mixture of public funding and religious schools could result in the "impermissible effect of state-sponsored indoctrination" or a "symbolic union between government and religion." Agostini v. Felton, 521 U.S. 203, 223, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (O'Connor, J. opinion). Here, however, "[t]he incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributed to the individual recipient, not to the government, whose role ends with the disbursement of benefits." Zelman, ___ U.S. at ___, 122 S.Ct. at 2467. The School District distributes funds to dozens of student groups to facilitate their speech and club activities. "[I]f numerous private choices, rather than a single choice of government, determine the distribution of aid, pursuant to neutral eligibility criteria, then a government cannot, or at least cannot easily, grant special favors that might lead to a religious establishment." Mitchell, 530 U.S. at 810, 120 S.Ct. 2530 (cited with approval in Zelman, ___ U.S. at ___, 122 S.Ct. at 2467). There is no risk of government indoctrination of students if student/staff time, school supplies and transportation are provided to all student groups, no matter how vociferously the World Changers make their point. In light of the numerous and diverse student clubs on the school's campus, the School District cannot easily grant special favors that might lead to a religious establishment. Widmar, 454 at 277, 102 S.Ct. 269. "It is precisely for these reasons that we have never found a program of true private choice to offend the Establishment Clause." Zelman, ___ U.S. at ___, 122 S.Ct. at 2467.
 
 
 74
 As the School District admits: (1) the ASB fund was comprised entirely of student fees; (2) like the newspaper at issue in Rosenberger, World Changers is a student organization and thus the School District would not be "paying the bills of a church or similar organization"; (3) there is no indication that World Changers intends to conduct "religious services," and indeed its stated purpose suggests otherwise; and (4) no funds are paid directly to the student organization, but rather are paid to outside vendors. Under the logic of Supreme Court precedent, the expenditure of governmental funds cannot be prohibited whenever those funds pay for a service that is, pursuant to a religion-neutral program, used by a group for sectarian purposes. Rosenberger, 515 U.S. at 843, 115 S.Ct. 2510 (noting that "[i]f a religious student organization obtained access on [a] religion-neutral basis and used a computer to compose or a printer or copy machine to print speech with a religious content or viewpoint, the States's action in providing the group with access would no more violate the Establishment Clause than would giving those groups access to an assembly hall").
 
 
 75
 That the provision of school supplies and school vehicles in this case involves public, rather than ASB, funds does not change our consideration. In Mitchell v. Helms, 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000), the Supreme Court upheld against an Establishment Clause challenge a Louisiana program that provided "library books, computers, and computer software, and also slide and movie projectors, overhead projectors, television sets, tape recorders, VCR's, projection screens, laboratory equipment, maps, globes, filmstrips, slides, and cassette recordings" to parochial schools. Id. at 803, 120 S.Ct. 2530. The Court found that it was permissible for the government to provide such benefits to religious schools so long as the aid was offered on a neutral basis and was secular in content. Id. at 835-36, 120 S.Ct. 2530. There is no question that the provision of school supplies, even when purchased with School District funds, would be offered on a neutral basis to school clubs and is secular in content. For the same reason, providing school vehicles for field trips would not result in the direct funding of religious organizations. As in Rosenberger, it would simply require providing equal access to a "service" that happens to be paid for by public funds. Moreover, there is no doubt that religious Policy 5525 groups would receive access to publicly owned vehicles as part of a neutral program.
 
 
 76
 Second, we must consider whether the high school community would feel coercive pressure to engage in the Club's activities. Mergens, 496 U.S. at 251, 110 S.Ct. 2356. In Mergens, the Supreme Court specifically rejected the contention that high school students would perceive equal access for religious groups as endorsement of religion. The Court explained:
 
 
 77
 [T]here is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect. We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis.
 
 
 78
 Id. at 250, 110 S.Ct. 2356. Moreover, the Court explained, the school's fear of a "mistaken inference of endorsement is largely self-imposed, because the school itself has control over any impressions it gives its students." Id. at 251, 110 S.Ct. 2356. As in Mergens, the School District here can dispel any "mistaken inference of endorsement" by making it clear to students that a club's private speech is not the speech of the school. There is no indication in this case, at least as to inclusion in the ASB forum, that requiring access to religious groups would endorse religion any more than in Mergens.
 
 
 79
 Accordingly, we hold that the First Amendment requires that the School District grant the World Changers equal access to the school yearbook, audio/visual equipment, school supplies, and school vehicles.
 
 V. Conclusion
 
 80
 Because the School District has violated Prince's rights under the Act and the Free Speech Clause of the First Amendment, the judgment of the district court is REVERSED and REMANDED for proceedings consistent with this opinion.
 
 
 81
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Senate Report 98-357 was written by the Senate Committee on the Judiciary to accompany the committee's favorable recommendation to the Senate of Senate Bill 1059, a proposed Equal Access ActSee S.Rep. No. 98-357, at 1. Although Senate Bill 1059 was not the bill that ultimately became the Equal Access Act, much of the Act was derived from Senate Bill 1059, and the Senate report accompanying that bill is relevant to our analysis. See id.; see also Timothy M. Gibbons, Note, The Equal Access Act and Mergens: Balancing the Religion Clauses in Public Schools, 24 Ga. L.Rev. 1141, 1161-64 (1990).
 
 
 [2]
 See, e.g., 130 Cong. Rec. at 20933 (statement of Rep. Frank) ("I opposed the last version of the equal access bill, I spoke against it, and I voted against it. I intend to vote in favor of [the Act as passed]. The bill as it initially came before us had some flaws. Those flaws that bothered me have been corrected.... The original bill would have given the force of law to the right of students to meet during the school day. The bill we have before us now deals with before school and after school."); id. at 20938 (statement of Rep. Ratchford) ("[A]s someone who opposed the earlier version of this bill, I stand here today and say that what we now are offered deserves our support. This bill is distinguished dramatically from the legislation which we were earlier called upon to consider earlier this year. First of all, it limits activities to before and after school hours, and we do not get into the very gray question of what is noninstructional time."); id. at 20946-47 (colloquy between Reps. Smith and Perkins) (Rep. Smith: "I am one of those who voted against the original bill, but as I understand it almost every objection has been met in this bill that most of us had to the original bill.... The school will have complete control during school hours over their meetings and it is only after school hours they can either deny a group the right to meet, but, if they deny or grant a right to meet to any group of students they must treat all the same, is that right?" Rep. Perkins: "That is correct."); id. (statement of Rep. Slattery) ("I rise in support of the equal access legislation we are considering today.... I could not support the earlier version of the Equal Access Act because I felt that its provision contained tremendous potential for abuse. That bill did not require that student-initiated religious meetings be held before or after the schoolday. I believe that the Senate debate on this amendment makes it clear that religious meetings cannot take place side by side with other school activities where attendance would be compulsory."); id. at 20948 (statement of Rep. Synar) ("I am glad to have the opportunity today to support a true equal access bill — one that ... assures that religious meetings are student led and only occur before and after school hours."); id. at 20949 (statement of Rep. Schneider) ("[M]y original reservations have been met, and I will now be able to support the bill.... [S]tudent-initiated meetings can now take place only before or after school hours....").
 
 
 [3]
 See, e.g., 130 Cong. Rec. at 20943 (statement of Rep. Smith of Nebraska) ("I supported Mr. Bonker's equal access bill when it was considered by this House on May 15 [H.R. 5345], and I rise in even stronger support of the improved equal access provisions we have before us today .... This improved equal access language .... applies only to groups meeting before or after school."); id. at 20948 (statement of Rep. Hall) ("It says that voluntary groups can meet in classrooms during off-hours."); id. at 19235-36 (statement of Sen. Levin) ("[I]f students voluntarily, outside of school hours, want to have a religious meeting ... they are allowed to do so .... The pending amendment will allow students equal access to secondary schools student-initiated religious meetings before and after school where the school generally allows groups of secondary school students to meet during those times.").
 
 
 [4]
 See, e.g., 130 Cong. Rec. 20938 (statement of Rep. Kastenmeier, an opponent of the bill) ("I am pleased to see that the equal access proposal before us today is a significant improvement... however, I believe that several important problems are still outstanding.... Also unclear in [sic] the matter of when the activities authorized by the legislation may take place. In both the House and Senate, colloquy has suggested that these activities are not to take place during the school day, but before and after school only. Again, this meaning may be clear to some legislators, but not to the thousands of school administrators who will be trying to interpret the law and to others who may mean to challenge it."); id. at 20942 (statement of Rep. Oakar, an opponent of the bill) ("Supporters of this legislation state that the revised version of the bill will provide access to school facilities before and after school. The legislation permits use of school buildings during noninstructional hours which I interpret to mean nonclass periods. This does not limit these religious meetings to before and after school but to periods when actual instruction is not taking place.... I urge my colleages [sic] to vote `no' on this legislation."); id. at 19237 (statement of Sen. Denton, original sponsor of S. 1059) ("My interpretation would be that, if the school allows noninstructional periods before or after actual `classroom instruction' — which is the term used — sometime during the day, then the school cannot discriminate against student-initiated groups who wish to meet voluntarily at that time; for example, during lunch periods, open activity periods, and in schools with staggered schedules where students are free to meet. I am willing to let that be subject to interpretation in the future.... It was this written perfecting amendment which I accept."); id. at 19241 (statement of Sen. Cranston, an opponent of the bill) ("What this amendment does, however, that I find objectionable, is to compel school districts to allow religious activity during the school day.").
 
 
 HALL, Circuit Judge, concurring:
 
 82
 I join the court's opinion in its entirety and write separately merely to respond to the dissent's argument that the Establishment Clause bars equal treatment of the World Changers and ASB clubs during student/staff time.
 
 
 83
 First, although the dissent sees no reason why Illinois ex rel. McCollum v. Bd. of Educ. of Sch. Dist. No. 71, Champaign County, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948) does not control the question, the reason follows directly from first principles. "We must in each case inquire first into the purpose and object of the governmental action in question." Rosenberger v. Rector and Visitors of the Univ. of Virginia, 515 U.S. 819, 838-39, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); see also Mitchell v. Helms, 530 U.S. 793, 807, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000). "A central lesson of our decisions is that a significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion." Rosenberger, 515 U.S. at 839, 115 S.Ct. 2510.
 
 
 84
 In McCollum, the purpose and object of the school was to promote religion, not to administer a student speech forum. 333 U.S. at 210, 68 S.Ct. 461. The school in question was opened up to religious teachers once a week so that they could come and conduct classes offering religious instruction. Id. at 205, 68 S.Ct. 461. To facilitate this program, the school disseminated printed cards to parents for use in granting permission to attend the classes. Id. at 207 n. 2, 68 S.Ct. 461. Although students who did not choose to take religious instruction were allowed to go to some other school room to pursue their secular studies, id. at 209, 68 S.Ct. 461, regular classes were not offered at the time, and only religious teachers from outside the school were permitted to enter in order to teach. Id. at 208 n. 3, 68 S.Ct. 461. Based on these facts, the Supreme Court held, "[t]his is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith." Id. at 210, 68 S.Ct. 461.
 
 
 85
 McCollum does not stand for anything near so broad a principle as that "the Establishment Clause forbids student religious activities in the public school building during periods when students are compelled by law to attend school in that building." Dissent at p. 1099. Nor do any of the other cases cited by the dissent focus on fact patterns in which students are merely permitted to attend club meetings during school hours. Rather, they focus on situations in which students were coerced by mandatory attendance policies or other official pressures to be exposed to religious instruction or exercises. See Lee v. Weisman, 505 U.S. 577, 581, 586, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (prayer at graduation ceremony for which attendance was "in a fair and real sense obligatory"); Edwards v. Aguillard, 482 U.S. 578, 581, 586-88, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (statute requiring teaching creationism whenever evolution is taught); School Dist. of Abington Township v. Schempp, 374 U.S. 203, 205, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (law requiring school day to begin with recitations from the Bible). Like McCollum itself, these cases support the more modest proposition that schools may not administer programs during the school day that are for the purpose of advancing religion. Thus, the fact that the Supreme Court has not elaborated a doctrine to underpin the dissent's argument that any religious activities must be banned from school grounds during the school day is not surprising — it has never adopted such a position.
 
 
 86
 Moreover, although we must be highly sensitive to the particular facts of each case where there is a potential conflict between free speech and the Establishment Clause, see Rosenberger, 515 U.S. at 847, 115 S.Ct. 2510 (O'Connor, J., concurring), the essential substance of the dissent's endorsement argument — that the school would create the perception of endorsement by granting religious clubs permission to use school facilities to meet during student/staff time while denying use of those facilities for other activities such as "hanging out" or playing base-ball — has been repeatedly rejected by the Supreme Court. See Good News Club v. Milford Central School, 533 U.S. 98, 118-19, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001); Rosenberger, 515 U.S. at 841-42, 850-51, 115 S.Ct. 2510 (opinion of Kennedy, J., for the Court and O'Connor, J., concurring); Bd. of Educ. of Westside Comm. Schools v. Mergens, 496 U.S. 226, 249-51, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). In Good News, Rosenberger, and Mergens, the school at issue created a limited speech forum and restricted access to those groups whose activities were consistent with the purposes of the forum. Good News, 533 U.S. at 102, 108, 121 S.Ct. 2093; Rosenberger, 515 U.S. at 823-34, 115 S.Ct. 2510; Mergens, 496 U.S. at 231-32, 110 S.Ct. 2356. In each, the Court held that the school at issue must give equal access to that forum to groups speaking on included subjects from a religious viewpoint. Good News, 533 U.S. at 120, 121 S.Ct. 2093; Rosenberger, 515 U.S. at 845-46, 115 S.Ct. 2510; Mergens, 496 U.S. at 247-48, 110 S.Ct. 2356. The pertinent issue for Establishment Clause purposes was not the privileged position that such groups had compared to those which were excluded as incompatible with the purposes of the forum, but rather their treatment compared to other groups who were included. See Good News, 533 U.S. at 114, 121 S.Ct. 2093; Rosenberger, 515 U.S. at 841-42, 115 S.Ct. 2510; Mergens, 496 U.S. at 252, 110 S.Ct. 2356. And the reason for this is simple: when a speech forum with constitutionally permissible restrictions based on the speaker's identity or the content of speech is established, it is not endorsement to treat like groups with respect to those criteria equally and unlike groups differently.
 
 
 87
 As the dissent emphasizes, the use of school facilities to meet during student/staff time involves an additional factual element in that student/staff time occurs during part of the day in which attendance at school is mandatory. But while this fact tinges the distinction between those activities that are compatible with the ASB forum from those that are not with the patina of official compulsion, it does not establish endorsement of religion or necessarily create the perception of such endorsement. There is no reason to believe that the school would have to administer a rule allowing all ASB and Policy 5525 clubs to meet during student/staff time on anything other than an equal basis. Nor is such equal treatment in this context any more likely to be seen as somehow unequal than in any other. See Mergens, 496 U.S. at 250, 110 S.Ct. 2356. At most, permission to meet during student/staff time merely shows the strength with which Spanaway Lake High School and the Bethel School District endorse activities which promote academic, vocational, personal, or social/civil/cultural growth of students, not that it endorses religion. Finally, as to the dissent's "entanglement" argument, the Establishment Clause does not prohibit all entanglements; only excessive ones that demonstrate that a government program has the impermissible effect of advancing religion. See Agostini v. Felton, 521 U.S. 203, 232-234, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). In this context, it is simply not true that teachers will be placed in the untenable position of requiring religious worship, indoctrination, or even discussions. During student/staff time the World Changers would presumably be allowed to discuss any club-related issue regardless of its religious content. In the unlikely event that members of the World Changers or a similar club decide to engage in impermissible activities such as playing hand-held video games during student/staff time, a teacher can simply direct them to stop doing so or return to their home room for normal activities such as homework and individualized instruction. While teachers admittedly do take on more than a merely custodial role during student/staff time, their required role in monitoring groups permitted to meet during that time is at most to limit speech activities to those that are consistent with the speech forum that the school has provided, not specifically to require religious speech. Nor must we presume that the teachers' exposure to a sectarian group will induce them to participate in inculcating religion. Id. at 234, 117 S.Ct. 1997.
 
 
 88
 Thus, there is simply no reason to distinguish this context from others in considering the primary effect of granting the World Changers and other like groups equal access to the ASB forum. In this case, as in prior ones, the broad spectrum of officially recognized student clubs and the fact that students are free to organize more such clubs counteract any message of official endorsement. See Mergens, 496 U.S. at 252, 110 S.Ct. 2356; Rosenberger, 515 U.S. at 850, 115 S.Ct. 2510 (O'Connor, J., concurring). Here, as in other contexts, "petitioners' fear of a mistaken inference of endorsement is largely self-imposed, because the school itself has control over any impressions it gives its students." Mergens, 496 U.S. at 251, 110 S.Ct. 2356. Without more, a school does not violate the Establishment Clause by granting permission for groups to meet during the school day on a religious-neutral basis.
 
 
 89
 BERZON, Judge, concurring in part and dissenting in part:
 
 
 90
 I join the court's opinion with the exception of Part IV(B). I do not join Part IV(B) for two reasons: First, requiring the Spanaway Lake High School ("the High School") to permit religious activity[1] during student/staff time ("SS Time") violates the Establishment Clause. SS Time is a period integral to the school day at which attendance is mandatory. The distinction between activities that occur during mandatory attendance periods and those that take place during time periods when attendance is voluntary is a critical one.
 
 
 91
 Second, I cannot agree with Part IV(B) of the majority's opinion to the extent that it holds that the Establishment Clause permits the provision for religious purposes of school vehicles, school supplies, and school audio and visual equipment, all paid for by public funds. In so holding, the majority goes beyond Mitchell v. Helms, 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000), by sanctioning governmental use of tax funded supplies and services for religious activities in public schools.
 
 I. STUDENT STAFF TIME
 
 92
 The period that Spanaway Lake High School sets aside for SS Time cannot fairly be characterized as anything but an integral part of the instructional school day. The SS Time period falls right in the middle of the student's daily schedule every Tuesday and Friday, as a regular class period from 10:10 a.m. to 10:40 a.m. Attendance at SS Time is mandatory, not voluntary. Students can receive an "F" grade for not attending, and must engage in "school-related" activities, such as school-affiliated club meetings, school assemblies, career surveys, work on homework, or one-on-one instruction from teachers. To the young people at Spanaway Lake High School, SS Time may be a brief respite from mathematics, chemistry, and Spanish, but it is still school, not free time.
 
 
 93
 The majority concludes, correctly, that Congress in devising the Equal Access Act saw a fundamental difference between periods of time when school attendance is mandatory and periods when it is not, requiring equal access only during the latter. Congress' decision to exclude from the Act's coverage class periods such as SS Time that form an integral part of the school day mirrors Establishment Clause jurisprudence. A long line of Supreme Court cases recognizes a heightened risk of unconstitutional entanglement and actual or perceived endorsement when public schools' mandatory attendance laws and religious instruction intertwine in public school classrooms.
 
 
 94
 In 1948, the Supreme Court in Illinois ex rel. McCollum v. Bd. of Educ. of Sch. Dist. No. 71, Champaign County, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), held unconstitutional under the Establishment Clause a public school program in which students were released from class to attend religious classes taught in the regular classrooms of the public school by non-public school teachers who volunteered at no cost to the school. The Court explained the school's system this way:
 
 
 95
 Students who did not choose to take the religious instruction were not released from public school duties; they were required to leave their classrooms and go to some other place in the school building for pursuit of their secular studies. On the other hand, students who were released from secular study for the religious instructions were required to be present at the religious classes. Reports of their presence or absence were to be made to their secular teachers.
 
 
 96
 Id. at 209, 68 S.Ct. 461. Thus, as in this case, the school in McCollum did not require any student to attend religious classes, but instead gave students the option of doing so in lieu of attending nonreligious activities.
 
 
 97
 The Court in McCollum nonetheless focused on the school's mandatory attendance policy in finding an Establishment Clause violation:
 
 
 98
 Pupils compelled by law to go to school for secular education are released in part from their legal duty upon the condition that they attend the religious classes. This is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith.
 
 
 99
 Id. at 209-210, 68 S.Ct. 461. And, further:
 
 
 100
 Here not only are the State's tax supported public school buildings used for the dissemination of religious doctrines. The State also affords sectarian groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the State's compulsory public school machinery. This is not separation of Church and State.
 
 
 101
 Id. at 212, 68 S.Ct. 461.
 
 
 102
 I see no reason why McCollum does not control the question whether the Spanaway Lake High School may absolve students from engaging in one or another of the secular activities that they must otherwise engage in during SS Time to participate on public school premises in a religious meeting of the World Changers. Much time has passed since McCollum, it is true. But despite the well-noted vagaries of the Supreme Court's Establishment Clause jurisprudence, see Jesse H. Choper, A Century of Religious Freedom, 88 Cal. L.Rev. 1709, 1741 (2000), the Court has never departed from the premise that the Establishment Clause forbids student religious activities in the public school building during periods when students are compelled by law to attend school in that building.
 
 
 103
 For example, the Court recently held, in Good News Club v. Milford Cent. Sch., 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001), that the Establishment Clause did not preclude a school from allowing a religious group to meet in a classroom after the school day. In so holding, the Court distinguished McCollum precisely on the ground that the Good News Club's "activities take place after the time when the children are compelled by state law to be at the school." Id. at 116 n. 6, 68 S.Ct. 461 (emphasis in original); see also id. at 115-16, 68 S.Ct. 461 (distinguishing Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), because in Lee the Court "concluded that attendance at the graduation exercise was obligatory," and explaining that in Good News, "where the school facilities are being used for a nonschool function and there is no government sponsorship of the Club's activities, Lee is inapposite."); id. at 117, 112 S.Ct. 2649 (distinguishing Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), on the ground that "Edwards involved the content of the curriculum taught by state teachers during the schoolday to children required to attend.") (first emphasis in original); cf. id. at 117 n. 7, 107 S.Ct. 2573 (School Dist. of Abington Township v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), "is inapposite because this case does not involve activity by the school during the schoolday."). Compare Zorach v. Clauson, 343 U.S. 306, 311 n. 6, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (upholding release time program where religious classes were not held on school property and there was no "indication that the public schools enforce[d] attendance at religious schools by punishing absentees from the released time programs for truancy").
 
 
 104
 Not surprisingly, this concern with religious instruction as part of the mandatory school day came up the first time the Supreme Court considered the Equal Access Act. Critically, in holding that the Act does not on its face violate the Establishment Clause, the Supreme Court in Bd. of Educ. of Westside Cmty. Schs. v. Mergens, 496 U.S. 226, 251, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), expressly relied on the fact that because the Act applies only to "noninstructional time" it "avoids the problems of ... mandatory attendance requirements." Id. (opinion of O'Connor, J.) (citing Edwards, 482 U.S. at 584, 107 S.Ct. 2573; also citing McCollum, 333 U.S. at 209-10, 68 S.Ct. 461, for the proposition that: "release time program invalid where students were `released in part from their legal duty to attend school upon the condition that they attend the religious classes'"); see also id. at 261, 110 S.Ct. 2356 (Kennedy, J., concurring) (finding no Establishment Clause violation in part because "the meetings take place while school is not in session.").[2]
 
 
 105
 Ceniceros v. Bd. of Trustees of the San Diego Unified Sch. Dist., 106 F.3d 878, 880 (9th Cir.1997) is fully consistent with this line of Supreme Court cases. Ceniceros held that a public school's lunchtime qualified as noninstructional time under the Equal Access Act. In so holding, the court described the factual context this way:
 
 
 106
 At [the school], classroom instruction begins at 7:25 a.m. and ends at 11:30 a.m.; it resumes at 12:15 p.m. and continues until 2:10 p.m. The parties specifically stipulated that no classroom instruction occurs during the school's lunch hour. In fact, students are not even required to remain on campus during this time.
 
 
 107
 Id. (emphasis added). Ceniceros further pointed to the Establishment Clause concerns discussed in Mergens:
 
 
 108
 The only timing issue with which the Court concerned itself in Mergens is the Act's restriction of meetings to "noninstructional time." The Court found this limitation significant because it avoids the problems of mandatory attendance requirements, which the Court had previously struck down. Since the lunchtime meetings proposed by Ceniceros would resemble in every significant respect the[after school] meetings approved by the Court in Mergens, permitting Ceniceros' group to meet during lunchtime would not violate the Establishment Clause.
 
 
 109
 Ceniceros, 106 F.3d at 882 (citations omitted) (emphasis added). The majority does not cite any case in this court or any other appellate court holding religious activity on school premises during a period when attendance is mandatory permissible under the Establishment Clause, and I am not aware of any such case.[3]
 
 
 110
 Although neither the Supreme Court nor this court has had an opportunity to explain in doctrinal terms why religious activities during periods when school attendance is required, recorded, and graded violates the First Amendment, recent Establishment Clause jurisprudence suggests two compelling reasons:
 
 
 111
 First, ensconcing a religious meeting in a public school classroom during the school day will be seen as — and will actually be — an endorsement of religion. See Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 307-08, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000); Rosenberger v. Rector and Visitors of Univ. of Virginia, 515 U.S. 819, 841-42, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). As the School's Vice Principal reported, SS Time is a time for students to "do school-related sorts of things." Students who must choose from one of a set of school-related activities during a mid-school-day period are only in a limited sense "voluntarily" attending the World Changers meeting. They do not have the option to go home and "hang out" with friends, play baseball, practice piano, skateboard around the neighborhood, or do a wide range of other activities that children engage in during truly free time. Instead, they are required to attend one of the activities the School District has chosen to allow them to attend during a certain time period, because the School District has determined that the activities have some school-related value. The likely perception that the School District is "endorsing" the activities that students are permitted to engage in during the mandatory school day is an accurate one.
 
 
 112
 Second, the mandatory attendance factor dictates entanglement of school employees in religious activity. See Mitchell, 530 U.S. at 845, 120 S.Ct. 2530 (O'Connor, J., concurring); Mergens, 496 U.S. at 252-53, 110 S.Ct. 2356 (opinion of O'Connor, J.). According to the Vice Principal, SS Time "is considered a scheduled class and it's on the student's schedule as such ... and ... roll is taken." Teacher involvement necessarily becomes more than custodial when the teacher is supervising a scheduled class.
 
 
 113
 If, for example, the World Changers met during SS Time, but instead of engaging in activities pertaining to the club such as prayer and religious singing chose to spend the time discussing non-club related issues — movies or sports, for instance — the students would not be participating in the "school-related" activities for which the School District designed SS Time and mandates attendance. Presumably, to fulfill the purposes of SS Time the assigned teacher would be required to redirect the discussion to the religious purpose of the meeting. After school, in contrast, the teacher-supervisor's concerns would relate not to the content of the meeting but only to safety, decorum, and other "custodial" matters.
 
 
 114
 To avoid precisely such impermissible endorsement and entanglement, Congress chose to extend the reach of the Act only to the limited open forum created by public schools before and after actual classroom instruction takes place, not to instructional periods during the school day. The majority so recognizes, but then concludes that the free speech provisions require otherwise and that there is in fact no Establishment Clause violation created. Because the majority holds that religious activity at a public school site during a regularly scheduled class period, when students are required to be on the premises, does not violate the Establishment Clause, I respectfully dissent.
 
 
 115
 II. SUPPLIES, VEHICLES, & AUDIO /VISUAL EQUIPMENT
 
 
 116
 The majority holds that Spanaway Lake High School must provide the World Changers religious club access to the School District's supplies (e.g., markers, paper), vehicles, and audio and visual equipment, utilizing the same standards as apply to non-religious student groups' access to such supplies and services. I disagree. The Establishment Clause prohibits the School District from giving or lending to the World Changers for direct use in religious activities supplies and services paid for by public tax funds. This crucial prohibition on the use of public tax funds for supplies to be used for religious purposes is set forth in Justice O'Connor's concurring — and controlling — opinion in Mitchell, 530 U.S. at 836, 120 S.Ct. 2530, which the majority here does not address.[4]
 
 
 117
 The Mitchell Court upheld against an Establishment Clause challenge a program under which the federal government distributes funds to state and local agencies, which in turn use those funds to provide public and private schools, including religious schools, with educational materials and equipment similar to those at issue here. A majority of the Court in Mitchell reaffirmed that neutrality, although an important consideration in an Establishment Clause analysis, does not alone permit the conclusion that public aid used for religious purposes is constitutional. Id. at 840, 120 S.Ct. 2530 (O'Connor, J., concurring); id. at 883-84, 120 S.Ct. 2530 (Souter, J., dissenting). Rather, Mitchell turned upon the consideration that the public aid at issue in that case supported secular functions of religious schools, not avowedly religious classes or services.
 
 
 118
 Of critical importance here, Justice O'Connor "disagree[d] with the plurality's conclusion that actual diversion of government aid to religious indoctrination is consistent with the Establishment Clause." Id. at 840, 120 S.Ct. 2530 (O'Connor, J., concurring); see also id. (O'Connor, J., concurring) ("[A]ctual diversion is constitutionally impermissible."); id. at 857, 120 S.Ct. 2530 (O'Connor, J., concurring) ("To establish a First Amendment violation, plaintiffs must prove that the aid in question actually is, or has been, used for religious purposes."). Justice O'Connor relied upon the following "constitutionally sufficient" statutory and agency safeguards that, among others, prevented diversion of public aid to religious purposes: the aid included only secular materials and equipment; use of the aid for "religious worship or instruction" was prohibited; non-public schools signed assurances that the aid would be used only for secular purposes; and agencies conducted monitoring to detect impermissible uses. Id. at 861-63, 120 S.Ct. 2530 (O'Connor, J., concurring).
 
 
 119
 Without addressing the import for this case of Justice's O'Connor's opinion in Mitchell, the majority here, relying largely on the Court's decision in Rosenberger, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700, allows actual diversion for religious purposes of the School District's supplies, AV equipment, and vehicles. The cost of purchasing and maintaining the School District's supplies and services, however, comes not from the ASB student fund, but from the School District's general, tax-derived public funding. For this reason, Rosenberger, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700, is inapposite. See id. at 841, 115 S.Ct. 2510 ("[T]he $14 paid each semester by the students is not a general tax designed to raise revenue for the University.... Our decision, then, cannot be read as addressing an expenditure from a general tax fund."); id. at 847, 851-52, 115 S.Ct. 2510 (O'Connor, J., concurring) ("Our cases have permitted some government funding of secular functions performed by sectarian organizations.... These decisions, however, provide no precedent for the use of public funds to finance religious activities.... The Student Activities Fund... represents not government resources, whether derived from tax revenue, sales of assets, or otherwise, but a fund that simply belongs to the students.").[5]
 
 
 120
 The majority also attempts to characterize the School District's policy of giving or lending supplies, AV equipment, and transportation to student groups as one of "private choice," in order to bring this case within the Supreme Court's recent decision in Zelman v. Simmons-Harris, ___ U.S. ___, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), upholding an educational program that provides tuition aid "vouchers" for students to use to pay to attend public or private, including religious, schools. See id., slip op. at 10-14 (discussing the importance of the fact that the voucher program involves individual private choice, rather than government distribution of financial aid to religious organizations). This is not, however, a "private choice" case. The School District, not private choice, decides whether a student club will receive access to the School's supplies, AV equipment, and transportation for field trips.
 
 
 121
 Although the distribution of the type of supplies and services at issue would not perhaps as readily lend itself to a private choice program as does the payment of tuition aid, a private choice program could operate to distribute the School's supplies and services for purposes of extracurricular activities. For instance, the School District could provide each student with a certain number of markers and sheets of construction paper for that student to use for any student group activity in which the student chose to participate. Or the school could provide each student with a $10 "voucher" to go toward the expenses of a field trip selected by the student.
 
 
 122
 No such private choices, however, are made by individual students at Spanaway Lake High School. The distribution of supplies and services to the various student groups instead resembles the distribution of similar supplies and services to the various schools in Mitchell, which Justice O'Connor made clear did not qualify as a private choice program. See 530 U.S. at 841, 120 S.Ct. 2530 (O'Connor, J., concurring); see also id. at 842-43, 120 S.Ct. 2530 (O'Connor, J., concurring) (rejecting the notion that a per capita endorsement program equates with a private choice program for Establishment Clause analysis).
 
 
 123
 Finally, were it sufficient for Establishment Clause purposes that "[p]roviding... school supplies and bus transportation is not a direct payment to the World Changer's coffers," as the majority asserts, see ante at 1092, Justice O'Connor would have had little reason to write her separate opinion in Mitchell. The supplies lent by the government to the religious schools in that case likewise did not constitute a "direct payment" to a religious organization's "coffers."
 
 
 124
 As I see it, Mitchell controls, and under Mitchell, the School District must allow the World Changers equal access to the School District's supplies and services for non-religious uses but must, as did the aid program in Mitchell, also prevent the club from using the supplies and services for religious purposes, including "religious worship or instruction." 530 U.S. at 861, 120 S.Ct. 2530 (O'Connor, J., concurring). For instance, the World Changers should have access (assuming other noncurricular groups do) to School District supplies to announce meetings or for other secular purposes, but using School District supplies to create a proselytizing poster cannot be permitted. Likewise, the School District could transport the World Changers in a School District vehicle to a homeless shelter for the students to perform community service work, but not to a church meeting or service.
 
 
 125
 The School District should, I believe, have the first opportunity to decide what safeguards it will employ to ensure that publicly-funded supplies and services are not put to religious uses. Mitchell requires, at a minimum, however, that the supplies and services consist only of secular services, materials, and equipment, and that the School District establish a policy limiting the use of its tax-funded property and services to only secular purposes. Id. at 861-62, 120 S.Ct. 2530 (O'Connor, J., concurring).
 
 
 126
 The majority opinion does not acknowledge the necessity of such limitations under the Establishment Clause jurisprudence as clarified in Mitchell. I therefore respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 It is quite clear that the World Changers club does engage in religious observance. The club's constitution sets forth the following goals:
 1) Encourage Christian leadership in students at SLHS;
 2) Evangelize our campus for Jesus Christ;
 3) Through love, praise, and prayer, bring hope to the students of SLHS;
 4) Provide uplifting messages to bring enjoyment to everyday life;
 5) Through songs, dance, drama, and comedy teach students that Jesus Christ is the Answer to the confusion, pain, and uncertainty this world offers.
 The club's constitution further requires that the club's president "open and close each meeting with prayer .... [and] oversee the spiritual direction and oversight of the World Leaders Club and the spiritual content of the regular weekly meetings." The constitution also provides for a "Worship Leader" officer who must "select the praise and worship songs and lead the World Leaders Club ... in prayer and worship...."
 
 
 [2]
 The section of Justice O'Connor's opinion inMergens discussing the Establishment Clause issue commanded only four votes, but because it relied on narrower grounds than did Justice Kennedy's opinion for two Justices, which reached the same result, Justice O'Connor's opinion controls. See Smith v. Univ. of Washington, Law Sch., 233 F.3d 1188, 1199 (9th Cir.2000) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (quoting Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)).
 
 
 [3]
 As far as I have been able to determine, there has been exactly one published decision adopting a view similar to that of the majority with regard to religious activities during the mandatory public school day on public school premisesBender v. Williamsport Area Sch. Dist., 563 F.Supp. 697 (M.D.Pa.1983). Bender was reversed by the Third Circuit, for reasons similar to those expressed in this dissent, but the Supreme Court vacated the Third Circuit's decision with instructions to dismiss the appeal because the appellant lacked standing to bring it. Bender v. Williamsport Area Sch. Dist., 741 F.2d 538 (3d Cir.1984), vacated 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986).
 
 
 [4]
 Justice O'Connor's concurring opinion inMitchell controls the outcome of any case that, as here, turns on a distinction between her opinion and the plurality opinion in that case. No opinion in Mitchell commanded a majority vote. Justice O'Connor's concurring opinion rested on narrower grounds than did the plurality's opinion, and is therefore the governing precedent. See Smith, 233 F.3d at 1199 (quoting Marks, 430 U.S. at 193, 97 S.Ct. 990).
 
 
 [5]
 Justice O'Connor's concurring opinion inRosenberger is of particular importance because her vote was necessary to the majority and she joined the opinion of the majority "[s]ubject to these comments" in her separate opinion, which relied on narrower grounds than did the majority opinion. Id. at 852, 115 S.Ct. 2510. Likewise, to the extent broad statements made in Rosenberger are narrowed by Justice O'Connor's opinion in Mitchell, the Mitchell opinion, more recently issued, controls.