**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TRUTH, an unincorporated
association; SARICE UNDIS, a
minor, by and through her father,
LARRY UNDIS; JULIANNE STEWART, a
minor, by and through her parents,
PAUL and ANNA STEWART,
　　　　　　　*Plaintiffs-Appellants,*

　　　　　　　v.

KENT SCHOOL DISTRICT; BARBARA
GROHE, Superintendent of Kent
School District; MIKE ALBRECHT,
Principal of Kentridge High
School; ERIC ANDERSON, Assistant
Principal of Kentridge High
School, in their official capacities,
　　　　　　　*Defendants-Appellees.*

No. 04-35876

D.C. No.
CV-03-00785-MJP

AMENDING
OPINION ONLY
TO INCLUDE
CONCURRENCE

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
July 27, 2006—Seattle, Washington

Filed April 25, 2008
Amended September 9, 2008

Before: J. Clifford Wallace, Kim McLane Wardlaw, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Wallace;
Concurrence by Judge Fisher

12441

## COUNSEL

Nathan W. Kellum, Alliance Defense Fund, Memphis, Tennessee, for the plaintiffs-appellants.

Michael B. Tierney, Mercer Island, Washington, for the defendants-appellees.

Jane M. Whicher, Port Townsend, Washington, for amicus American Civil Liberties Union.

Sara J. Rose, Washington, D.C., for amicus Americans United for Separation of Church and State.

David F. McDowell, Los Angeles, California, for amicus Anti-Defamation League.

## ORDER

The opinion filed on April 25, 2008 in the above-captioned case is amended only to include the concurrence filed this date.

Appellant's Petition for Rehearing En Banc is still pending.

## OPINION

WALLACE, Circuit Judge:

Appellants Truth, Sarice Undis, and Julianne Stewart (collectively, Truth) appeal from a summary judgment in favor of the Kent School District and other appellees (collectively, District). Truth alleges violations of the Equal Access Act (the Act), the First Amendment rights of free speech and expressive association, the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause. We have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse and remand.

### I.

This appeal arises from Truth's attempt to form a student club at Kentridge High School (Kentridge), which is part of the Kent School District. Under the relevant policies at Kentridge, "[u]nchartered clubs are not permitted to exist." To obtain a charter, students must submit a proposed charter to the Associated Student Body (ASB) Council and secure approval.

Beginning in the fall semester of 2001, appellants Undis, then a junior, and Stewart, then a sophomore, attempted to form a Bible club at Kentridge. Undis and Stewart submitted a "Club Charter Application" (first charter) for official recognition as an ASB organization in September 2001. This first charter indicated that the club's name was to be "Truth" and that the purpose of the organization was to "have a Bible study to encourage and help become better people with good morals." Under the section "Membership Criteria," the first charter indicated that the group was to be "[o]pen to anyone." The charter also proposed that it would designate a "quote of the week for announcement" and "once a month decorate [the] school with a theme."

The ASB Council discussed Truth's first charter at a September 2001 meeting, and several students objected to chartering Truth. The ASB Council decided to consult with the Assistant Principal, appellee Eric Anderson. Anderson and appellee Mike Albrecht, Principal of Kentridge, later told Undis that they would speak with the school's attorney regarding the legality of granting Truth ASB recognition. Albrecht stated that "the problem with the September 2001 proposal was that it involved broadcasting a weekly Bible quote over the school's public address system and monthly decoration of the school in a biblical theme."

No action was taken on the first charter for the remainder of the 2001-02 school year. During that time, Undis asked Anderson to make a decision on Truth's application on at least ten occasions, to no avail. Sometime in the spring semester of 2002, all ASB clubs were instructed to resubmit their charters. The record does not reveal any further activity on Truth's application during the summer and fall semesters of 2002.

During this period, we decided *Prince v. Jacoby*, which involved a request by a Bible club for ASB recognition in a different Washington school district. 303 F.3d 1074 (9th Cir.

2002). On January 7, 2003, an attorney for Truth, Robert Tyler, wrote to Albrecht stating that it was "constitutionally imperative that [Kentridge] grant [appellants'] proposed Bible Club treatment and rights equal to all other noncurriculum clubs." The letter also insisted that Kentridge "immediately adhere to the requirements of the Equal Access Act and the First Amendment," and threatened litigation if Kentridge did not comply.

On January 30, 2003, Tyler sent a second letter to Michael Harrington, counsel for the Kent School District. Tyler requested the forms required to establish an ASB club, and threatened litigation if Truth's charter was not approved by February 4.

On February 2, as requested by Anderson, Undis and Stewart submitted a new application (second charter). The second charter removed the quote-of-the-week and monthly theme decoration provisions of the first charter. The club's stated purpose was now to "provid[e] a biblically-based club for those students interested in growing in their relationship with Jesus Christ." Although membership would be open to all students, the second charter restricted voting membership to "members professing belief in the Bible and in Jesus Christ." Officers would also be required to "believe in and be committed to biblical principles."

After a third letter to Harrington from Tyler, the second charter was discussed at an ASB Council meeting on March 27. Some students expressed disapproval of the club's name, suggesting that it "implies that every other religion at Kentridge is a lie." Some council members also expressed concerns that granting the charter would violate "[c]hurch and state" and that the voting membership should be open to everyone. Additionally, members suggested that students could go to "Young Life," a non-ASB recognized organization that met on Kentridge's campus after school hours. The minutes of the March 27 meeting reveal that the question of

whether to approve the second charter was discussed for twenty minutes. No vote was taken.

The second charter was next addressed at an ASB Council meeting on April 1. After a brief clarification on the role of the advisor for the club, the minutes show that Anderson stated that if the ASB Council voted to approve the charter, he would consult the District's attorneys and Kentridge would make a final decision on approving the charter. The Counsel voted eleven to six against approval of Truth's second charter.

On April 3, Truth filed a complaint in the United States District Court for the Western District of Washington, alleging that defendants had violated the Act, as well as the First Amendment rights of free speech and expressive association, the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause. Truth sought injunctive and declaratory relief as well as nominal damages.

On April 9, Anderson sent Stewart a letter informing her of her right to resubmit Truth's application for ASB club recognition: "As was discussed at the ASB meeting on March 28th, by making minor changes to Article[s] I and III of the proposed Constitution for your club, you will address the points raised." Article I sets forth the name of the club and Article III contains the voting membership and officer restrictions. Anderson advised Stewart to "be prepared to resubmit by the April 25th ASB Meeting." Under the Kentridge ASB Constitution, "[a]ny rejected charters must be resubmitted within two weeks of rejection with the required changes made or the charter shall be permanently rejected."

Stewart and Undis submitted the third charter on April 24. The third charter maintains the proposed name "Truth." However, it divides the membership into three categories: voting members, non-voting members, and attendees. Meetings are open to everyone. But the "privilege of membership is contingent upon the member complying in good faith with Christian

character, Christian speech, Christian behavior and Christian conduct as generally described in the Bible." The charter application also lists a "true desire to . . . grow in a relationship with Jesus Christ" under the "Membership Criteria" heading. In order to be a voting member or officer, students are required to sign a "statement of faith." The statement of faith requires the person to affirm that he or she believes "the Bible to be the inspired, the only infallible, authoritative Word of God." A voting member must also pledge that he or she believes "that salvation is an undeserved gift from God," and that only by "acceptance of Jesus Christ as my personal Savior, through His death on the cross for my sins, is my faith made real." Other than the ability to call oneself a "member," there is no difference between the rights of non-voting members and attendees.

The third charter was discussed at the April 25 ASB Council meeting. The ASB Council again objected to the name, selectivity provisions, and the presence of religion in school. The council voted nineteen to zero to deny approval of the charter, with one member undecided. The minutes give four reasons why the charter was not accepted: 1) "Name," 2) "Pledge to vote," 3) "Segregating," 4) "Religious club in school."

On May 6, Tyler wrote to the Kent School District's counsel stating that it was his "understanding from the ASB Constitution that this rejection by the ASB is the final decision." The letter also provided that Tyler "was unable to locate any rights to appeal the decision of the ASB," but that if there were "a right to appeal the decision of the ASB," he asked that the letter "serve as a formal request for appeal."

Anderson advised Undis and Stewart in a May 12 letter "that pursuant to Kent School District Policy 2340, [they had] the ability to discuss this matter with Mr. Albrecht," and mentioned the possibility of discussions with the District superintendent or the ombudservices office. Although Tyler's May 6

letter would appear to have invoked these processes, no further action was taken by the District. Policy 2340 concerns "religious related activities or practices." The policy does not refer to ASB recognition, and the ASB Constitution does not refer to this policy as providing an avenue for an appeal of the District's decisions, which are otherwise "final."

Although Undis and Stewart have both graduated from Kentridge, they have indicated that another student, Lindsay Thomas, is prepared to assume leadership of the club if the charter is approved.

The Kent School District has three policies relevant to this appeal. First, Policy 3210 provides that "[t]he district will provide equal educational opportunity and treatment for all students in all aspects of the academic and activities program. Equal opportunity and treatment is provided without regard to race, creed, color, national origin, sex, marital status, previous arrest . . . , incarceration, or physical, sensory or mental disabilities." The district court held that inclusion of "creed" indicates that discrimination based upon religion is prohibited. That ruling has not been challenged on appeal.

Second, Policy 2153 provides for "noncurriculum-related, non ASB student groups," which groups the principal shall approve provided they meet several additional requirements, such as that they do not disrupt the school environment. While Policy 2153 groups may meet on school grounds before or after school, these groups do not receive other benefits accorded only to ASB-sponsored student clubs. Most significantly, only ASB-chartered groups may receive ASB funding and engage in purchasing through the Kent School District Finance Department. Each ASB club is provided with a faculty advisor or adult advisor designee, who must be present at all club meetings and assists in the planning and handling of the club's affairs. ASB clubs are also allowed to conduct meetings during noninstructional time, advertise their activities in school, use the public address system, and are

recognized in the school yearbook. The District states that Truth "is free to operate as a private Policy 2153 group," but argues that Truth was properly denied ASB recognition.

Third, Policy 2340P regulates "religious related activities or practices," and provides guidelines for schools addressing religious holidays, symbols, ceremonies, topics, activities, and beliefs. This policy also provides that "[s]tudents, parents, and employees who are aggrieved by practices or activities conducted in the school or district may seek resolution of their concern first with the building principal, then with the district superintendent or designee, or use ombudservices, which is available through the Legal Services Department."

Washington State also has a relevant non-discrimination law, which the District relies on to justify its denial of ASB recognition for Truth. In 2003, Washington Revised Code § 49.60.215 (West 2006) provided that:

> It shall be an unfair practice for any person or the person's agent or employee to commit an act which directly or indirectly results in any distinction, restriction, or discrimination, . . . or the refusing or withholding from any person the admission, patronage, custom, presence, frequenting, dwelling, staying, or lodging in any place of public resort, accommodation, assemblage, or amusement, except for conditions and limitations established by law and applicable to all persons, regardless of race, creed, color, national origin, sexual orientation, sex, the presence of any sensory, mental, or physical disability, or the use of a trained dog guide or service animal by a disabled person.

The District has argued that these non-discrimination policies require it to deny ASB recognition to Truth.

As of April 3, 2003, there were thirty ASB-recognized clubs at Kentridge. While the record does not contain the

charters of all the clubs, it appears that many of them have selective membership criteria. Indeed, each charter application contains a section for "Membership Criteria."

The EarthCorps, for example, requires members to show "interest and dedication toward environmental issues." Similarly, the Key Club requires that members be "interested in service, qualified scholastically, of good character, possessing leadership potential . . . [and] willing to perform at least fifty hours of . . . service." The Gay-Straight Alliance requires that students "must be willing to work towards the goals of the club" to be members. These goals include "bring[ing] GLBTQ [Gay, Lesbian, Bisexual, Transgendered, and Questioning] issues into the open, while working to decrease homophobia." Other goals include "changing stereotypes" and "fight[ing] heterosexism and other forms of oppression." The National Honor Society selects its members based on "outstanding scholarship, character, leadership, and service," and requires them to "behave in a courteous and respectful manner, refraining from language and actions that might bring discredit upon themselves." It also requires members to refrain from using or possessing alcohol or illegal substances. Participation in school sports requires maintaining a certain grade point average and attendance record, not using drugs or alcohol, and complying with the "sports code." Finally, a Men's Honor Club and a Girl's Honor Club also operate at Kentridge as ASB-recognized groups. Each club has gender-exclusive membership.

The district court entered summary judgment on all of Truth's claims under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), with the exception of the Act claim. The court held that the requirements of municipal liability under 42 U.S.C. § 1983 were not satisfied, and therefore entered summary judgment in favor of the District. It also held that the actions against the individual defendants in their official capacities were functionally equivalent to suits directly

against the municipality, and therefore Truth's claims against them failed.

The district court ruled on the merits of the Act and some of the First Amendment claims, addressing the latter as an alternate holding if its *Monell* ruling were to be reversed. It held that the restrictions on general membership in the third charter constituted a legitimate basis for denying the third charter and that these claims therefore failed.

The district court did not rule on the remaining claims based on its belief that "Plaintiffs' cursory Equal Protection Clause, Establishment Clause, and Free Exercise Clause arguments are all subsumed within their First Amendment argument." The district court also did not address the District's argument that granting ASB recognition to Truth would violate the Establishment Clause.

On appeal, both sides agree that only the third charter is before us. Truth makes this concession even though this action was filed before the third charter and its complaint only addresses the denial of its second charter.

This appeal requires us to review many determinations by the district court. As to each issue, we review de novo. We review a district court's summary judgment de novo. *See Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004). In determining whether summary judgment was appropriate, we view the evidence in the light most favorable to Truth, the non-moving party. *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). "We may affirm on any ground supported by the record." *Id.* We also review de novo the district court's *Monell* rulings, *see Doe v. Lebbos*, 348 F.3d 820, 825 (9th Cir. 2003), its "decision regarding the scope of a constitutional right," *see United States v. Napier*, 436 F.3d 1133, 1135-36 (9th Cir. 2006), and its interpretation of the Act, *see SEC v. McCarthy*, 322 F.3d 650, 654 (9th Cir. 2003).

## II.

Before addressing the merits, we consider our jurisdiction. The District argues that Truth lacks standing under *City of Los Angeles v. Lyons,* 461 U.S. 95 (1983), because Truth has failed to meet the "likelihood of recurrence" requirement. The District asserts that Truth "cannot say the ASB or the District will always deny another Club application or even the same application."

**[1]** In order to establish Article III standing,

> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000). Although the District has not made any arguments regarding these specific factors, we have an independent obligation to address whether we have subject-matter jurisdiction. *See Dittman v. California*, 191 F.3d 1020, 1025 (9th Cir. 1999). "[A]t the summary judgment stage the plaintiffs need not establish that they in fact have standing, but only that there is a genuine question of material fact as to the standing elements." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002).

**[2]** With respect to injunctive relief, the Supreme Court has also required that a plaintiff show that "he is realistically threatened by a repetition of [the violation]." *Lyons*, 461 U.S. at 109. "The plaintiff need only establish that there is a reasonable expectation that his conduct will recur, triggering the alleged harm; he need not show that such recurrence is probable." *Jones v. City of Los Angeles*, 444 F.3d 1118, 1127 (9th

Cir. 2006), *citing Honig v. Doe*, 484 U.S. 305, 318 & n.6 (1988). While we have extended this requirement to declaratory relief, *see Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006), it does not apply to monetary damages, *see Lyons*, 461 U.S. at 105. The District's standing argument therefore does not implicate Truth's standing to seek nominal damages.

The District asserts that the Establishment Clause, state law, and its own non-discrimination policies mandate that it deny ASB recognition to Truth. If the District believes that three independent and binding legal authorities compel it to deny Truth's application, we do not see how the District might approve the same or a similar charter request in the future.

**[3]** The District's written non-discrimination policies also support Truth's standing arguments. We have held that plaintiffs "may demonstrate that an injury is likely to recur by showing that the defendant had . . . a written policy, and that the injury 'stems from' that policy. Where the harm alleged is directly traceable to a written policy there is an implicit likelihood of its repetition in the immediate future." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004) (internal quotations and alterations omitted). Here, the harm is traceable to the District's policies, which the District has argued compel it to deny ASB recognition to Truth.

Additionally, despite Tyler's request that the District treat his letter as a "formal request for appeal," the District took no action. This is evidence that another charter request is likely to meet the same fate as the previous three. Finally, the District has provided nothing beyond its own speculation that the outcome might be different if Truth submitted a fourth charter. The legal positions it has taken in this litigation strongly suggest that no similar applications will ever be approved.

**[4]** Under these circumstances, we conclude that Truth has established at least a genuine issue of material fact as to

whether there is a reasonable expectation that the alleged injury will recur. Therefore, Truth has standing to seek each of its requested forms of relief.

The District also suggests that this dispute is not ripe for review, and that we thus lack jurisdiction, because Truth did not bring the dispute to the Kent School District Board or Superintendent through Policy 2340P. The District is wrong. The Supreme Court has explicitly held that exhaustion is not required for claims brought under 42 U.S.C. § 1983. *See Steffel v. Thompson*, 415 U.S. 452, 472-73 (1974). Exhaustion cannot be dispositive under a ripeness analysis; otherwise ripeness doctrine would impose a *de facto* exhaustion requirement, in violation of *Steffel*. Thus, the alleged failure to exhaust administrative remedies may be at most only a factor in the ripeness analysis.

**[5]** Nevertheless, it appears that Truth did exhaust the formal appeal system. Tyler's May 6 letter to the District's counsel asked that the letter "serve as a formal request for appeal." The District has not provided any reason why this notification was not sufficient to trigger its appeals process, and no reason is apparent in the record. The District's failure to take any action as a result of this request does not indicate that Truth failed to bring the matter to the attention of the District. Under these circumstances, there is at least a genuine issue of material fact as to whether Truth exhausted the District's grievance procedures.

Nearly every other factor suggests that this case is ripe for decision. Under the Kentridge ASB Constitution, "[a]ny rejected charters must be resubmitted within two weeks of rejection with the required changes made or the charter shall be permanently rejected." The ASB Constitution neither provides for any additional review, nor suggests that the ASB Council's decision lacked finality.

Furthermore, there is no doubt that the effects of the denial of Truth's charter have been felt in a concrete way by the

appellants. Truth's members have experienced three denials of their applications, as well as protracted delays in obtaining any action from the ASB Council and District. The harm that Truth has complained of does not "rest[ ] upon contingent future events" or ones that "may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation omitted). Instead, Truth complains of discrete events that have already occurred.

**[6]** Finally, "in evaluating ripeness, courts assess both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 779-80 (9th Cir. 2000) (internal quotation omitted). We conclude the hardship to Truth in denying adjudication outweighs the hardship to the District in deciding this appeal. Truth's application for ASB recognition languished for nearly sixteen months without any significant action being taken, and the ASB process appears to have stalled until Truth obtained counsel and threatened to sue. More than five years have passed since the submission of the first charter, and declining to decide this appeal now would present a significant hardship to appellants.

**[7]** By contrast, the hardship to the District is significantly less severe. The District has been aware of Truth's arguments for a long time and has had ample opportunity to take corrective action or change its policies, if it so desired. Its legal positions on appeal show that it does not believe any remedial action is appropriate and that it believes the denial of ASB recognition was proper. We therefore conclude that this case is ripe for decision.

### III.

**[8]** We must also consider the district court's ruling that the requirements of *Monell* are not met. *Monell* permits section 1983 actions against municipalities, but requires plaintiffs to show that their injuries resulted from "execution of a govern-

ment's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." 436 U.S. at 694. *Monell*'s requirements do not apply where the plaintiffs only seek prospective relief, which is the case here. *See Chaloux v. Killeen*, 886 F.2d 247, 250-51 (9th Cir. 1989). The District acknowledges the controlling effect of *Chaloux*, but argues that it should be overruled because it "rests on shaky grounds."

**[9]** It is well established in our circuit that while

> a three judge panel normally cannot overrule a decision of a prior panel on a controlling question of law, we may overrule prior circuit authority without taking the case en banc when an intervening Supreme Court decision undermines an existing precedent of the Ninth Circuit, and both cases are closely on point.

*Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1123 (9th Cir. 2002) (internal citation and quotations omitted). The District argues that two Supreme Court cases, *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997), and *McMillian v. Monroe County*, 520 U.S. 781 (1997), show that the "Supreme Court has re-emphasized the importance and vitality of the doctrine that requires a municipal policy as a precondition to a lawsuit under § 1983." Neither of these cases addresses whether *Monell* applies to actions only seeking prospective relief. We have no authority to overrule *Chaloux*. *Chaloux* applies, and the district court's *Monell* ruling is reversed.

## IV.

Relying on its non-discrimination policies, the District points to three aspects of Truth's third charter that justify its decision to deny the club ASB recognition: 1) the general membership restrictions, 2) the leadership and voting mem-

bership restrictions, and 3) the name "Truth." The district court granted summary judgment based only on the first justification, and explicitly declined to reach the other two. Accordingly, we too limit our analysis to the general membership restrictions. So long as the District had at least one permissible basis for rejecting Truth's charter, the district court properly granted summary judgment, and we need not address the District's remaining justifications.

We begin our analysis by considering whether the District violated the Act. If we determine that it did not, we then move on to consider whether the District's actions ran afoul of the First Amendment. *See Prince v. Jacoby*, 303 F.3d 1074, 1077 (9th Cir. 2002) ("We consider each of Prince's access claims separately, first under the Act, and then the First Amendment, to the extent we find them outside the scope of the Act").

### A.

**[10]** States have the constitutional authority to enact legislation prohibiting invidious discrimination. *See Roberts v. United States Jaycees*, 468 U.S. 609, 624-26 (1984) (reviewing the history of state anti-discrimination laws and observing that a "State enjoys broad authority to create rights of public access on behalf of its citizens"). Truth asserts that it does not discriminate based on religion in violation of the plain language of the District's policies, but rather imposes a code of conduct not unlike those of other approved ASB clubs. Even assuming that non-Christians would be able to comply with Truth's view of "Christian character, Christian speech, Christian behavior and Christian conduct," we hold that the requirement that members possess a "true desire to . . . grow in a relationship with Jesus Christ" inherently excludes non-Christians.

**[11]** Having determined that the third charter violates the District's non-discrimination policies, we are led to hold that the District's denial of ASB recognition on this account

would be consistent with the Act. The Act requires federally-funded schools that have created a limited open forum to grant religious clubs benefits and privileges afforded to all other non-curriculum clubs. *See Bd. of Educ. of the Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 235-36 (1990); *Prince*, 303 F.3d at 1081 ("[T]he term 'equal access' means what the Supreme Court said in *Widmar* [*v. Vincent*, 454 U.S. 263, 267-71 (1981)]: religiously-oriented student activities must be allowed under the same terms and conditions as other extra-curricular activities . . ."). *Prince* held that the rights protected under the Act include equal access to some of the benefits associated with ASB status, including ASB funding and public communication techniques. 303 F.3d at 1084-90. The District does not argue that it is not required under the Act to provide equal access to the ASB program.

In interpreting the Act, we begin with its plain language. "Where the intent of Congress has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Id.* at 1079 (internal quotations and citation omitted). Where there may be uncertainty, however, we rely on the Supreme Court's direction that the Act is to be "interpreted broadly," *Mergens*, 496 U.S. at 239, as well as cases deciding analogous issues under the First Amendment. *Cf. Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 855-56 (2d Cir. 1996) (adopting similar approach).

**[12]** By its plain terms, the Act prevents only denials of access or fair opportunity or discrimination "on the basis of the religious, political, philosophical, or other content of the speech at [a club's] meetings." 20 U.S.C. § 4071(a). Therefore, once it is established that the secondary school receives federal funds and has created a limited open forum, the club must demonstrate two additional elements to prevail: 1) a denial of equal access, or fair opportunity, or discrimination; 2) that is based on the "content of the speech" at its meetings.

**[13]** The District denied Truth ASB status, at least in part, based on its discriminatory membership criteria, not the religious "content of the speech."[1] The Act does not define "content of the speech," but that phrase has a particular meaning in First Amendment jurisprudence. We have held that "whether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." *Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005) (quotations and citation omitted). Similarly, a "restriction on expressive activity is content-neutral if it is . . . based on a non-pretextual reason divorced from the content of the message attempted to be conveyed." *Id.* (quotations and citation omitted).

The Act, through which Congress extended the reasoning of the Supreme Court's 1981 decision in *Widmar v. Vincent* to secondary schools, *see Mergens*, 496 U.S. at 235, tracks *Widmar*'s emphasis on discrimination based on the content of the plaintiff's speech. *Widmar* struck down a state university's regulation prohibiting the use of university buildings or grounds "for purposes of religious worship or religious teaching." 454 U.S. 263, 265 (1981). *Widmar* thus precluded a university's "discriminatory exclusion from a public forum based on the religious content of a group's intended speech," *id.* at 269-70, but not its "right to exclude . . . First Amendment activities that violate reasonable campus rules." *Id.* at 277. Likewise, the Act prevents a school's unreasonable limitation on the conduct of a club to the extent the limitation is justified with reference to the expressive content of the regulated conduct. *Cf. Ward v. Rock Against Racism*, 491 U.S. 781, 791

---

[1]Although the District gave several reasons for denying Truth's charter, some of which appear to have been based on the content of Truth's speech, the district court based its analysis only on the group's discriminatory membership policies. Therefore, we too limit our analysis to this issue when determining whether the district court's summary judgment was appropriate.

(1989) ("Government regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech" (internal quotations and citation omitted)).

**[14]** Congress could have written the Act to protect religious clubs against a burden on their speech or activities, but did not. For example, when Congress passed the Religious Land Use and Institutionalized Persons Act, it not only prohibited discrimination against religious groups as such but also limited governments' abilities to impose even neutral, nondiscriminatory policies against them:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
>
> > (A) is in furtherance of a compelling governmental interest; and
> >
> > (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). Thus, Congress knows how to draft a statute placing otherwise content-neutral laws of general applicability that incidentally burden a First Amendment activity under the same judicial scrutiny as laws specifically targeting the religious content of a group's expression. *See Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978, 985-86 (9th Cir. 2006). That is not the case here. The Act clearly allows exclusions that are not "content"-based.

**[15]** The Act's legislative history strengthens our conclusion that it prohibits only content-based restrictions on reli-

gious groups. The legislative history focuses on Congress's intent to end school districts' previous practices of treating religious groups inequitably and forbidding them from meeting on campus. *See* S. Rep. 98-357, at 6, 1984 U.S.C.C.A.N. 2348, 2352 (1984) ("Despite *Widmar*, many school administrators across the country are prohibiting voluntary, student-initiated religious speech as an [e]xtracurricular activity"); *id.* at 15, 1984 U.S.C.C.A.N. at 2361 ("[S]chool authorities across the country are banishing religious clubs from campus or placing such onerous restrictions on them that meetings become almost impossible"). The Senate Report recognized the possibility that religious groups like Truth might claim that content-neutral policies regulating club membership violate the Act, and disclaimed any such intent:

> At the same time, the guarantee of equal access does not require special treatment for religious groups. Religious groups are accorded only the same rights and privileges as are granted to other student groups. In practice, however, this means that not all student groups would receive exactly the same privileges. There could be many neutral and impartial time, place, and manner restrictions placed on the use of school facilities which might produce situations in which some voluntary groups would not receive precisely the same access received by others. . . . The access determination could not be made, however, on the basis that the nature of the activity was religious.

*Id.* at 39, 1984 U.S.C.C.A.N. at 2385. The District's non-discrimination policies are not time, place or manner restrictions. But like such restrictions, the policies are content-neutral. This strongly suggests that Congress did not intend the Act to apply to non-discrimination policies.

[16] The parties do not dispute that the Kent School District receives federal funding, or that Kentridge has created a lim-

ited open forum for extracurricular student groups. The District contests, however, whether the Act's guarantee of equal access, fair opportunity, and non-discrimination protects Truth's freedom to exclude those who do not share Christian values from its general membership. On their face, the District's non-discrimination policies do not preclude or discriminate against religious speech. Truth also has not shown that the District justifies its non-discrimination policies with reference to the content of a message Truth's discriminatory conduct may attempt to convey. The policies are content-neutral. Therefore, to the extent they proscribe Truth's discriminatory general membership restrictions, the policies do not implicate any rights that Truth might enjoy under the Act. *Cf. Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,* 547 U.S. 47, 60 (2006) (holding that a statute or regulation that conditions government benefits on a non-discriminatory campus access policy is properly categorized as conduct, not speech).

Our decision is not inconsistent with that of the Second Circuit, which has focused on the term "speech" in the Act rather than the content-neutrality (or lack thereof) of school policies. *See Hsu,* 85 F.3d at 856 (rejecting argument that Act was not implicated because "the School did not base its qualified recognition of the Club on what would be said at the Club meetings, but on what could be characterized as the Club's 'act' of excluding non-Christians from leadership"); *id.* at 859 (Act triggered "when an after-school religious club excludes people of other religions from conducting its meetings . . . to protect the expressive content of the meetings"). The court's decision in *Hsu* is readily distinguishable from the case at hand. In *Hsu*, a Christian group was seeking to impose a religious test for all of its *leadership* positions. *Id.* at 849. The court held that the group's ability to exclude non-Christians from some, but not all, of these leadership positions constituted "speech" within the meaning of the Act. *Id.* at 858. In contrast, we are only concerned with Truth's *general* membership requirements. The Second Circuit's decision in *Hsu* directly supports our holding with respect to these require-

ments. The court held that "a religious test for membership or attendance" would be "plainly insupportable," since "[i]t is difficult to understand how allowing non-Christians to attend the meetings and sing (or listen to) Christian prayers would change the Club's speech." *Id.* at 858 & n.17.

**[17]** In short, Truth has not shown that the District's non-discrimination policy restricts ASB status on the basis of religion or the religious content of speech. Truth also argues, however, that the District violated the Act by allowing certain groups an *exemption* from the non-discrimination policy. Here we understand Truth to be challenging an allegedly arbitrary or discriminatory practice of granting waivers to non-religious groups, but not religious groups. This challenge is different in kind from one asserting that the application of the non-discrimination policy to Truth violates Truth's rights under the Act. If indeed the District has a policy of enforcing the non-discrimination policy only against religious groups, this policy would of course violate the Act. Many of the so-called 'exemptions' that Truth contests are in fact consistent with the District's non-discrimination policy. For example, several clubs, such as the EarthCorps and the Gay-Straight Alliance, require their members to support a specific political cause, but nothing in the District's non-discrimination policy prohibits discrimination on the basis of political belief. However, at least two groups, the Men's Honor Club and the Girl's Honor Club, were granted ASB recognition even though their membership is based on gender, a protected ground under the District's policy. There is no evidence in the record as to why these groups were allowed apparent waivers from the District's non-discrimination policy. Thus, to the extent Truth alleges that the District provided waivers to these groups while denying them to others, and that decision was made on the basis of religion or the religious content of speech, Truth has raised a triable issue of fact.[2] Therefore, we reverse the

---

[2]Although Truth has raised a triable issue of fact, we call attention to two potential problems with its argument. First, Congress has specifically

district court's summary judgment and remand for further proceedings on this limited issue.

## B.

**[18]** We next address whether, and if so how, the First Amendment may apply where a school denies ASB recognition to a student club based on its membership criteria. As an initial matter, it is important to emphasize that the members of Truth are not seeking merely to associate as a group; they are seeking to associate as a *school-sponsored* group. Specifically, ASB recognition would give Truth access to ASB funds, additional access to the school's property and facilities, and special rights to post materials around the school. Therefore, we must evaluate the District's denial of ASB recognition as a restriction on a "limited public forum." *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (applying limited public forum analysis to religious group's request for student activities funds); *see also Prince*, 303 F.3d at 1091 (holding that a school, through its ASB program, "created a limited public forum").

The limited public forum framework "has been the source of much confusion" and the precise contours of the term

allowed for "separate but equal" gender discrimination in the context of school and youth activities. *See* 20 U.S.C. § 1681(a)(6) (providing that gender discrimination is allowed with regard to certain social fraternities and sororities and volunteer youth organizations that have traditionally been limited to one sex). Therefore, that the District exempts the Men's and Girl's Honor Clubs from its overarching gender discrimination policy does not, by itself, suggest an arbitrary or discriminatory application of that policy so as to violate the Act. Second, another high school and a junior high school in the District have granted ASB-recognition to other Bible groups that do not discriminate in their membership criteria, making it even less likely that the District's application of its anti-discrimination policy in this case was merely a pretext for religious animus. Nevertheless, because the record is devoid of any evidence as to the actual reason that the District granted a non-discrimination waiver to the Men's and Girl's Honor Clubs, we must remand for further proceedings.

"have not always been clear." *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001) (internal quotations and citation omitted). The Supreme Court first addressed the concept, indirectly, in *Widmar*. The Court recognized that, although the state is not required to open certain fora to public discourse, once it elects to do so, it "assume[s] an obligation to justify its discriminations and exclusions under applicable constitutional norms." *Widmar*, 454 U.S. at 267-68. Two years later, in *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 44-45 (1983), the Supreme Court clarified that there are three categories of government-run fora. "At one end of the spectrum are streets and parks which have immemorially been held in trust for the use of the public." *Id*. at 45 (internal quotations omitted). On the opposite end of the spectrum are those government properties that have not been traditionally considered open to the public. *Id*. at 46. Finally, falling somewhere in between are limited public fora, which "consist[ ] of public property which the state has opened for use by the public as a place for expressive activity." *Id*. at 45.

**[19]** In *Rosenberger*, the Supreme Court held that the government may exclude speech in a "limited public forum," so long as its reasons for doing so are viewpoint neutral and "reasonable in light of the purpose served by the forum." 515 U.S. at 829 (quotations and citation omitted). Access to ASB recognition qualifies as a limited public forum. *See Prince*, 303 F.3d at 1091. Therefore, we must consider whether the District's policy of restricting access to the ASB forum based on compliance with its non-discrimination policy is viewpoint neutral and reasonable in light of the purposes of the forum.

**[20]** The ASB Constitution makes it clear that the purpose of the organization "is to develop attitudes of and practice in good citizenship within the school; to promote harmonious relations between students, clubs, and activities; and to act as a forum for student and faculty expression." The constitution further states that this purpose will be carried out by

"[h]elping the student body develop a regard for law and order by obeying, honoring, and sustaining the laws of Washington State and King County, as well as the rules of Kentridge Senior High School. . . ." These broad statements of purpose show that the purpose of the ASB program is to advance the school's basic pedagogical goals. The Supreme Court has emphasized that part of a school's mission is to instill in students the "shared values of a civilized social order," which includes instilling the value of non-discrimination. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988). Therefore, the District's decision to restrict access to the ASB program based on a group's willingness to adhere to the school's non-discrimination policy is reasonable in light of the purposes of the forum.

Because this policy was reasonable in light of the purposes served by the ASB, we must next consider whether the group's exclusion was viewpoint neutral. The Supreme Court has explained that "[v]iewpoint discrimination is . . . an egregious form of content discrimination," and occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the *rationale* for the restriction." *Rosenberger*, 515 U.S. at 829 (emphasis added); *see also Perry Educ. Ass'n*, 460 U.S. at 46 (regulation on access to a forum is not viewpoint neutral if it is "an effort to suppress expression merely because public officials oppose the speaker's view"). In cases where restriction to the forum is based solely on the group's religious viewpoint, the restriction is invalid. This was the case in *Prince*, where the school refused to recognize the school group World Changers "based purely on the [group's] religious viewpoint." 303 F.3d at 1091.

**[21]** Here, in contrast, the school is not denying Truth access based solely on its religious viewpoint, but rather on its refusal to comply with the District's non-discrimination policy. The District was therefore not engaging in viewpoint discrimination; the "perspective of the speaker" was not the "rationale" for denying Truth access to the limited public

forum. *See Rosenberger*, 515 U.S. at 829. Applying the non-discrimination policy to exclude Truth does not show that the school administrators acted "merely because [they] oppose the speaker's view." *Perry*, 460 U.S. at 46. In short, the District no more engaged in viewpoint discrimination by excluding Truth for refusing to comply with its non-discrimination policy than it would have engaged in viewpoint discrimination by refusing to grant ASB status to a Student Pro-Drug Club that refused to obey the school's anti-drug policy. *Cf. Morse v. Frederick*, 127 S.Ct. 2618, 2629 (2007) (holding that schools may censor even *private* student speech that occurs on school grounds that "they reasonably regard as promoting illegal drug use").

**[22]** This conclusion, of course, rests on the premise that the ASB actually denied Truth's recognition based on its failure to comply with the District's non-discrimination policy. There is evidence in the record that other groups, such as the Men's and Girl's Honor Clubs, were granted ASB recognition despite violating the District's non-discrimination policy. Therefore, to the extent Truth argues that it was denied an *exemption* from the non-discrimination policy based on the content of its speech, we hold it has raised a triable issue of fact, and reverse the district court's summary judgment.

## V.

**[23]** Truth also makes a claim under the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause. The district court did not explicitly reach these claims, on the grounds that Truth's "cursory Equal Protection Clause, Establishment Clause, and Free Exercise arguments are all subsumed within their First Amendment argument . . . ." On appeal, Truth continues to give cursory treatment to these claims. Nevertheless, Truth may have a valid argument. As discussed earlier, we are remanding to the district court to determine whether Truth was denied an exemption from the District's non-discrimination policy, and whether that denial

was based on religion or the content of Truth's speech. To the extent Truth can make out a colorable First Amendment violation on these grounds, it may also have a Free Exercise claim, since "the Supreme Court noted that free exercise claims implicating other constitutional protections, such as free speech, could qualify for strict scrutiny review . . . ." *Am. Family Ass'n v. City & County of San Francisco*, 277 F.3d 1114, 1124 (9th Cir. 2002). Moreover, if Truth can demonstrate that it was singled out for unequal treatment on the basis of religion, it may also have a potentially valid Equal Protection or Establishment Clause argument. Therefore, we remand these issues to the district court to be considered along with the exemption issue discussed previously.

Finally, the District has argued that the ASB has free speech rights that would be violated if it were compelled to recognize Truth as an ASB organization. The ASB is not a party to this appeal and there is no indication that the District has authorization from the ASB to assert any such First Amendment claims. We conclude that the District lacks prudential standing to assert the ASB's free speech rights. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) ("[A] party generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." (quotations and citation omitted)).

## VI.

It is prudent to address only those issues necessary for our decision on the third charter application. We hold only that the District did not violate the Act or Truth's First Amendment rights by applying its non-discrimination policy to require Truth to remove its general membership provision. To the extent Truth alleges that the District violated the Act or the First Amendment by refusing to provide an exemption to its non-discrimination policy—based on Truth's religion or the content of its speech—we reverse the district court's summary judgment, and remand for further proceedings.

**REVERSED AND REMANDED.**

---

FISHER, Circuit Judge, concurring, joined by Judge WARDLAW:

We write separately to amplify on one issue discussed in our main opinion. Truth argued that it must be granted access to the ASB forum because conditioning its access to the ASB program on a change to its discriminatory membership policy would infringe its right to engage in speech through "expressive association." Expressive association may be burdened when the state requires a group to change its membership criteria, *see Boy Scouts of Am. v. Dale*, 530 U.S. 640, 656 (2000); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984), or when the state conditions access to a traditional public forum upon such changes, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 579 (1995). When the use of school facilities is part of a general public forum, denying access to those facilities may also implicate the right to associate freely. *See Healy v. James*, 408 U.S. 169, 180-81 (1972) (noting that the "college classroom with its surrounding environs is peculiarly the 'marketplace of ideas' " and that the complete "denial of use of campus facilities for meetings and other appropriate purposes" implicated a group's right to expressive association).

Even assuming, however, that Truth's exclusion of non-Christians allows it to engage in speech through expressive association, its exclusion from the ASB program on account of its discriminatory policy does not infringe its rights under the First Amendment. As our opinion explains, when the state creates a *limited* public forum, like the ASB program at issue here, it may restrict access to that forum so long as the restrictions are "viewpoint neutral and reasonable in light of the purpose served by the forum," even if these rules have the effect of limiting a group's ability to engage in protected speech,

such as the right to speak, publish on a particular topic or engage in expressive association. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) ("The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for *certain groups* or for the discussion of certain topics." (emphasis added)).

We reject Truth's suggestion that state action that burdens a group's ability to engage in expressive association must always be subject to strict scrutiny, even if the group seeks to engage in expressive association through a limited public forum. Expressive association is simply another way of speaking, only the group communicates its message through the *act of associating* instead of through an act of "pure speech" such as publishing, marching, speaking or performing. *See Dale*, 530 U.S. at 648 (holding that the First Amendment protects a group's ability to exclude members, if including such members would "impair the ability of the group to express those views, and only those views, that it intends to express"). There is no question that acts of expressive association are protected forms of speech under the First Amendment. *See id*. at 656; *Hurley*, 515 U.S. at 579. When the state *restricts access to a limited public forum* in a way that interferes with a group's speech or expressive association, however, we apply the lesser standard of scrutiny, even if the same burden on a group's rights *outside* a limited public forum would be subject to strict scrutiny. *See Rosenberger*, 515 U.S. at 829-30 (applying limited public forum analysis to a university policy that excluded a group's access to the school's student activity fund, thereby preventing it from publishing a newspaper). To hold otherwise would accord an act of "pure speech" such as publishing a newspaper — the core of what the First Amendment protects — less protection than an act of expressive association. We find no support for such a proposition, and Truth has identified none.[1] Truth, of course,

---

[1]In *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006), the Seventh Circuit reversed the denial of a preliminary injunction, hold-

has the option of operating as a Policy 2153 group on school grounds, *see* 524 F.3d at 963, and as such would be able to restrict its membership unfettered by the school's nondiscrimination policy. If Truth wants the additional benefits that come from participation in the ASB program, however, Truth must comply with the school's reasonable, viewpoint-neutral rules.

---

ing that a university group had shown that it was "reasonably likely to succeed on the merits" of its First Amendment claim after being excluded from campus for violating the school's nondiscrimination policy, which the group claimed infringed its right to expressive association. Although the Seventh Circuit applied strict scrutiny in addressing this claim, it notably stated that it could not even determine, on the limited record before it, whether the university had created an open, limited, or nonpublic forum. *See id.* at 866 ("Whether SIU's student organization forum is a public, designated public, or nonpublic forum is an inquiry that will require further factual development, and that is a task properly left for the district court.") *Walker* did not say that strict scrutiny would be appropriate in *all* cases, even if the university had created something less than an open forum.